JOHN W. ROWLEY, P. L. DAVIS, W. H. LIMING and THOMAS F. KEEFE, v. GEORGE W. CLARKE, W S. ALLEN, JOHN L. BLEAKLY, W. C. BROWN and A. H. DAVISON, Appellants.

**Statutes:** ADDITIONAL CAPITOL GROUNDS: CERTIFICATES OF INDEBTED-
1 NESS: CONSTITUTIONAL PROVISIONS. The certificates of indebtedness which the Executive Council is authorized to issue by the Act of the 35th General Assembly, relating to the purchase of additional capitol grounds, were not intended to supply casual deficits or failure of revenues, within the meaning of section 2 of article 7 of the Constitution. but may be ''for expenses not otherwise provided for.'' Those expenses authorized to be incurred in the act are such as are contemplated in the section of the Constitution referred to; that is extraordinary or unusual expenditures deemed necessary beyond the period for which ordinary revenues are provided. The term expenses as used in the constitutional provision for which a debt may be created means those lawfully incurred.

**Same:** STATE EXPENSES: CREATION OF DEBTS: LEVY OF TAXES. The
2 levy of a tax to be collected in the future does not constitute a provision for expenses presently created, within the contemplation of section 2, article 7 of the Constitution; and the mere fact that a statute authorizes the levy of future taxes to discharge a present obligation does not preclude the right to create a debt, but the statute may authorize the expense to be incurred and at the same time direct the issuance of evidence' of indebtedness and provide for a future tax out of which to extinguish the debt.

**Same:** STATE DEBTS: ANTICIPATION OF TAXES: ISSUANCE OF WAR-
3 RANTS. Certificates or warrants issued by the state in anticipation of and payable from revenues to be collected within the biennial period, do not create a debt within the provision of the constitution regarding the creation and payment of debts by the state government; and as taxes levied by the state within that period are certain to become available, they may be anticipated, after they have been levied, by the issuance of certificates or warrants.

**Same:** CAPITOL EXTENSION APPROPRIATION: CONSTRUCTION OF STATUTE.
4 The taxes beyond the biennial period authorized by the Capitol Extension Act of the 35th General Assembly, may not be anticipated by the issuance of certificates or warrants exceeding $250,-

000 for expenses incurred, without submitting the question to a vote of the people.

Same: CONSTITUTIONAL LAW: CONSTRUCTION OF STATUTES. Where two constructions of a statute are possible, without doing violence to the language of the act, one upholding the act as not in violation of the Constitution and the other denouncing it as inconsistent therewith, courts should assume that the legislature intended the former, and so construe the language thereof as to render it harmonious with the fundamental law.

*Appeal from Polk District Court.*—HON. J. H. APPLEGATE, Judge.

MONDAY, DECEMBER 5, 1913.

ACTION by citizens of Van Buren and Wapello Counties to enjoin the executive council of the state from purchasing certain real estate and from issuing interest-bearing certificates in payment thereof as authorized by chapter fourteen of the Acts of the Thirty-Fifth General Assembly. Decree was entered enjoining the issuance of certificates in payment of said property; otherwise the relief prayed was denied. Both parties appeal, that of defendants being first perfected.—*Reversed.*

*George Cosson*, Attorney General, *Henry E. Sampson* and *C. A. Robbins*, Assistant Attorneys, *O. S. Thomas*, Special Counsel, and *Parker, Parrish & Miller*, for appellants.

*J. C. Mitchell* and *McNett & McNett* and *J. C. Calhoun* and *Walker & McBeth*, for appellees.

LADD, J.—The executive council of the state consists of the Governor, Secretary of State, Treasurer of State, and the Auditor of State. It employs a secretary. The object of this action is to enjoin the executive council as such and each member thereof from acquiring for the state the property de-

scribed in and issuing the certificates authorized by chapter fourteen of the Acts of the Thirty-Fifth General Assembly, for that, as is contended, the provisions thereof are in violations of sections two and five of the seventh article of the Constitution of the state.     Section two of the act in question authorizes and directs the executive council, for the purpose ·of extending the capitol grounds, to ''purchase from time to time within said period of ten years any or all of the real estate not .already owned by the state'' appearing on the annexed plat:

Lots 1 to 6, inclusive, in block 5, four lots in block 4, and five lots in block 7 belong to the state as, of course, does the tract on which the capitol building is located. The purchase directed is of all other lots in the plat. With streets vacated there are over fifty acres in all and, if laid out and improved, as required, in accordance with the Allison Memorial Commission plan on file in the office of the Secretary of State made a part of the act by section 3, the grounds undoubtedly would be artistic and of great beauty. For the purpose of acquiring the land necessary and improving the grounds, section 1 of the act provides that

There shall be levied annually for a period of ten (10) years, commencing with the first levy made after the passage of this act, a special tax as follows: in each of the years 1913 and 1914, one-half mill on the dollar of the taxable property in the state, and in each of the remaining eight years such rate of levy to be fixed by the executive council as will yield approximately one hundred and fifty thousand dollars ($150,-000) annually. The proceeds of such levies shall be carried into the state treasury to the credit of a fund to be called the capitol grounds extension and improvement fund. The amount so realized by said levies shall be in lieu of all of the appropriations for said purposes during the said period of ten years.

Section 4 authorizes the executive council to acquire any or all of said real estate for the state and in so doing purchase same.

On option, contracts or in any other way which said council may deem expedient, . . . at any time within said period of ten years at its discretion and as the amount of money in said fund at any time may enable them to do. Payment for said real estate may be made by said executive council certifying to the State Auditor the amount due to any person at any time and the auditor then drawing a warrant in his favor on the State Treasurer payable out of the fund herein created.

Section 5 relates to condemnation of any property the council is unable to purchase, and section 6 to the leasing of property purchased until buildings thereon are removed and the disposition of said buildings, the proceeds to be included in the said fund. Section 7 directs the sale of a tract of land known as Governor Square, the proceeds to be turned into said fund, and section 8 declares that no part of the purchase price nor warrants or certificates issued therefor or interest thereon shall be paid otherwise than from said fund.

Were the lots to be paid only from this fund known as the capitol extension and improvement fund derived from the source mentioned on warrants drawn on the state treasury, the foregoing sections, it will be noted in passing, are complete in themselves and adequate for the objects intended. The sections following relate entirely to the anticipation of part or all of said fund. Section 9 enacts:

That for the purpose of accomplishing the earliest possible completion of the work contemplated herein and the carrying out of the plans provided for in this act, the executive council may anticipate the collection of the tax herein authorized to be levied for the extension and improvement of the capitol grounds, and for that purpose may issue interest-bearing warrants or certificates carrying a rate of interest not to exceed five per cent. per annum to be denominated 'capitol grounds extension and improvement warrants or certificates' and said warrants or certificates and interest thereon shall be secured by said assessment and levy and shall be payable out of the respective funds hereinbefore named, pledged to the payment of the same, and no warrants shall be issued in excess of taxes authorized or to be levied to secure the payment of the same. It shall be the duty of the State Treasurer to collect said several funds and to hold the same separate and apart in trust for the payment of said warrants or certificates and interest and to apply the proceeds of said funds pledged for that purpose to the payment of said warrants or certificates and interest. Such warrants or certificates shall be issued in sums of not less than one hundred nor more than one thousand dollars each running not more than ten years bear-

ing interest not exceeding five per cent. per annum, payable annually or semi-annually and shall be substantially in the following form.

Following this is a form of such certificate, not necessary to be set out. Section 10 directs that the certificates be issued only in pursuance of a resolution of the executive council specifying conditions as to amount, rate of interest and the like. Section 11 provides for the registry of said certificates, with the Treasurer of State, and section 12 authorizes the sale thereof at not less than par value. The contention of the plaintiffs is that the entire act is in violation of sections 2 and 5 of article 7 of the Constitution of the state, in that it authorized the creation of an indebtedness in excess of that therein permitted, without submitting the quesion to a vote of the people. These constitutional provisions may as well be set out:

Sec. 2. The state may contract debts to supply casual deficits or failures in revenues; or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent whether contracted by virtue of one or more acts of the general assembly or at different periods of time, shall never exceed the sum of two hundred and fifty thousand dollars; and the money arising from the creation of such debts shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever.

Sec. 5. Except the debts hereinbefore specified in this article, no debt shall be hereafter contracted by, or on behalf of this state, unless such debt shall be authorized by some law for some single work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof; but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority

of such law, shall be applied only to the specific object therein stated, or to the payment of the debt created thereby; and such law shall be published in at least one newspaper in each county, if one is published therein throughout the state, for three months preceding the election at which it is submitted to the people.

In determining whether the act in authorizing the issuance of interest-bearing certificates or warrants is inimical to these provisions of the Constitution, several questions necessarily are involved: (1) Would these certificates, if issued, constitute ''expenses not otherwise provided for'' within the meaning of section 2 of article 7 of the Constitution? (2) Can the executive council anticipate the revenues collectible within the biennial period by the issuance of certificates in advance payable therefrom as authorized without creating a debt within the meaning of these sections? (3) If these inquiries be answered in the affirmative, should the act be interpreted as empowering the executive council to issue certificates in anticipation of current revenues and in an amount beyond these not exceeding $250,000, or equaling the collectible taxes during the entire ten years within which levies are directed to be made? (4) If the latter be the true construction, then does the act authorize the creation of a debt in excess of the constitutional limitation?

I.   Plainly enough, the certificates contemplated in section 9 of the act were not intended ''to supply casual deficits or failure in revenues.''   Might they be issued ''to meet expenses not otherwise provided for''?   The state was created by the people to perform for them certain functions, the necessity for the performance of which was the only object of its creation.   These are in part defined in the Constitution and more fully in the statutes.   The three co-ordinate branches of government created for the protection and well-being of the people must be maintained and afforded facilities and equipment essential to the efficient discharge of

1. STATUTES:
additional
capitol
ground: certificates of indebtedness:
constitutional
provisions.

the duties devolving upon them. The insane and feeble-minded are to be cared for, those convicted of crime restrained of their liberty, the free school system maintained, opportunities for higher education afforded, and institutions provided for the deaf, dumb, and blind as well as for such others as the humane sentiments of modern life deem proper subjects for the care of the state. The attainment of these objects involves the exercise of great business sagacity and the expenditure of large sums of money, and the manifest design of the people in inserting this clause in the Constitution was to enable those charged with the duty of providing necessary funds for the maintenance of the government to exercise some discretion in distributing the burden of taxation, in event unusual or extraordinary expenditures are deemed necessary beyond the period for which ordinary revenues are provided. To meet expenses not otherwise provided for—that is, not made available in some other or different way or manner—the General Assembly is authorized to incur an indebtedness to a limited amount precisely as is done in the exigencies of private business. In other words, the state is not denied the advantage of postponing payment of expenses which may be extraordinary or unusual which are found beneficial in the ordinary enterprises of life.

The objects for which ''expenses'' may be incurred are not defined, but left to the discretion of those endowed with the power of incurring them. ''Expense'' is defined in Webster's Dictionary as meaning ''that which is expended, laid out or consumed; outlay; and hence the burden of expenditure; charge; cost.'' And ''price'' is said to be a synonym. Expenses when incurred is evidently what is meant, for there could be no expense by the state unless made in pursuance of law and the debt authorized may be created to meet such expenses.

Manifestly, the levy of a tax collectible in the future would not constitute a provision for expenses presently

created, and the mere fact that a future levy of taxes is author-
ized and the collection of these may subse-

2. Same: state
expenses:
creation of
debts: levy
of taxes.

quently be available to discharge the obliga-
tion assumed in the present expenditures does
not obviate right to create debt therefor. In
other words, a statute may authorize expenses to be incurred,
and at the same time direct the issuance of evidence of debt
in the way of bonds, warrants, or certificates, to meet such
expenses and in the same act provide for taxation out of which
to extinguish the debt. The act under consideration directs
the executive council to purchase the grounds about the capitol
and thereby to incur an expense. For this purpose, the levy
of one-half of a mill on all taxable property of the state is
ordered for each of the years of the biennial period, 1914 and
1915. Whether the revenue for these years available for the
purchase of the grounds will be sufficient was not known.
Were this inadequate, however, there would be no fund to meet
this deficiency, and such deficiency might not be anticipated,
as will hereafter appear, without incurring an indebtedness
by the state. True, the levy of taxes sufficient to provide
$150,000 per annum thereafter is authorized by the act, but
this might not be available ''for the purpose of accomplishing
the earliest possible completion of the work contemplated.''

The manifest design in allowing the executive council to
issue certificates payable out of funds other than those col-
lected during the biennial period was to assure ''the earliest
possible completion of the work,'' and we are of opinion that
any deficiency in the revenues collectible within that period
and available for this purpose would be an expense to meet
which a debt against the state not exceeding $250,000 may be
incurred by the issuance of certificates or warrants in pursu-
ance of the last four sections of the act under consideration.

II. Certificates or warrants issued in anticipation of
revenues collectible within the biennial period and payable

therefrom do not create a ''debt'' within the meaning of that term as used in the Constitution. The General Assembly convenes on the second Monday of January of the odd-numbered years and provides for revenues necessary to the per-formance of the different governmental functions during the

3. SAME: state debts: antici-pation of taxes: issu-ance of war-rants.

ensuing two years. Its·power of taxation is unlimited, and the taxes authorized to be levied and collected are legally certain to reach the state treasury, and therefore are as certainly available to meet the expenses authorized as are those col-lectible annually by a municipality.

It is well settled in this state that a municipality may anticipate the collection of taxes, and in defraying ordinary expenses may make appropriations and incur valid obligations to pay ''in advance of the receipt of its revenues,'' even though the treasury be empty, and no actual levy made, and the city be otherwise indebted to the full limit. *Grant v. City of Davenport,* 36 Iowa, 396; *Dively v. City of Cedar Falls,* 27 Iowa, 227; *French v. City of Burlington,* 42 Iowa, 614; *Phillips v. Reed,* 107 Iowa, 331; *City of Cedar Rapids v. Bechtel,* 110 Iowa, 198. In some other states the levy of taxes must actually have been made in order to warrant the antici-pation of revenues by issuing warrants in advance.

In the *Phillips* case it was said, in speaking of certain warrants: ''If the city had on hand or in prospect, at the time these warrants were issued, funds with which to meet them without trenching upon the rights of creditors for current expenses of the city, then the warrants were valid, although such funds may have been thereafter wrongfully applied to another purpose.''

Warrants issued in anticipation of taxes are held not to constitute a debt on the theory that moneys, the receipt of which is certain from the collection of taxes, are regarded as for all practical purposes already in the treasury and the con-tracts made upon the strength thereof are treated as cash transactions. Even though a municipality is indebted to the

constitutional limit, this does not prevent it from levying such taxes as are authorized by law nor from issuing warrants within the limits of such levy in anticipation of their collection, and, if the warrants issued are within the amounts lawfully levied, they do not create an additional debt. The proper officers of the state, as the executive council in this state, may anticipate the revenues to be expended by it which the Legislature has authorized to be collected within the biennial period, and contracts contemplating the appropriation of these are not regarded as debts against the state. As said by Field, C. J., in *State v. McCauley*, 15 Cal. 430: ''The eighth article (that limiting the state indebtedness corresponding to this state) was intended to guard the state from running into debt, and to keep her expenditures, except in certain cases, within her revenues. These revenues may be appropriated in anticipation of their receipt as effectually as when actually in the treasury.''

The same rule was laid down in *State v. Medberry*, 7 Ohio St. 529; the court saying:

So long as this financial system is carried out in accordance with the requirements of the constitution (two years' restriction), unless there is a failure or defect of revenue, or the General Assembly have failed, for some cause, to provide revenue sufficient to meet the claims against the state, they do not and cannot accumulate into a debt. Under this system of prompt payment of expenses and claims as they accrue, there is, undoubtedly, after the accruing of the claim, and before its actual presentation and payment, a period of time intervening in which the claim exists unpaid; but to hold that for this reason a debt is created would be the misapplication of the term 'debt,' and substituting for the fiscal period a point of time between the accruing of a claim and its payment, for the purpose of finding a debt; but, appropriations having been previously made and revenue provided for payment as prescribed by the constitution, such debts, if they may be so called, are, in fact, in respect of the fiscal year, provided for, with a view to immediate adjustment and payment. Such financial transactions are not therefore to be deemed debts.

The same rule was approved in *State v. Parkinson*, 5 Nev. 15.

The Supreme Court of South Dakota was called upon to advise the Governor of that state concerning the anticipation of the revenue by the issuing of warrants, and in response thereto said:

By general law, the Legislature has provided for the levy of an annual tax for meeting the ordinary expenses of the state. By so providing, in a constitutional manner, for the levy of a sufficient tax, it has provided a revenue, to the extent of the tax for the payment of the ordinary or current expenses of the state. It may then make appropriation of such revenue for diverse and specific purposes, included within the ordinary expenses of the state, and may authorize the issue of evidence of such appropriation in the form of warrants, without incurring an indebtedness therefor, within the meaning of said section 2, art. 13, of the constitution. If this were not so, then the appropriations of each Legislature in excess of the cash actually in the hands of the State Treasurer, and in the fund from which such appropriations were made, would, to the extent of such excess, constitute the creation of a debt against the state. It is well understood that the aggregate of the general appropriations of each Legislature in this, as in other states, generally greatly exceeds the amount of actual cash in the hands of the State Treasurer when such appropriations are made. The taxes levied and in process of collection are treated as in the state treasury, though not yet actually paid over to the State Treasurer. It has been ruled in several cases, and by high judicial authority, that state funds, so in sight, but not yet in hand, may be anticipated and appropriated as though actually in possession of the State Treasurer. Critically considered, it may constitute the incurring of an indebtedness; but it is not an indebtedness repugnant to the constitution, because its payment is legally provided for by funds constructively in the treasury. If the drawing of a warrant upon the state treasury is the incurring of indebtedness by the state, then the drawing of such warrant would violate the constitution, even if there was money in the state treasury to pay it, if the constitutional limit of indebtedness had been reached; for there must always be some time inter-

vening between the drawing of the warrant and its payment, and during such time the indebtedness of the state would be increased beyond the constitutional limit. Such an interpretation of the constitutional limitation would obviously be too hypercritical to be practicable or reasonable. It being once established, as we think, it is by the authorities already cited, that the revenues of the state, assessed and in process of collection, may be considered as constructively in the treasury, they may be appropriated and treated as though actually and physically there; and an appropriation of them by the Legislature does not constitute the incurring of an indebtedness, within the meaning of section 2, art. 13.

See, also, *In re Incurring of State Debts*, 19 R. I. 610, 37 Atl. 14, where the court said, in answer to the inquiry from the governor as to whether the General Assembly could in time of peace incur state indebtedness or borrow money in excess of the limit in the constitution, that;

In thus answering (in the negative) we do not mean to be understood that the General Assembly may not make appropriations or authorize the expenditure of money to an amount exceeding the sum named. The power of taxation resides in the General Assembly, and therefore it has power to raise by taxation such sums as it may deem necessary for the expenses of the state and the public benefit; and it may appropriate or authorize the expenditure of the money so raised for the purposes for which they are raised, and even, as we think, in anticipation of their actual payment into the state treasury.

The principle seems well established in reason and by authority. The power of General Assembly to tax is unlimited save by the two years' period. Of course, it may enact laws exacting the levy of a tax annually for any period in the future, but this is always subject to repeal or modification by subsequent General Assemblies. But revenues provided for during the biennial period are available to a legal certainty, for the General Assembly will not convene to repeal or modify within that time. The anticipation then by the issuance of

warrants or certificates to be paid therefrom is of the revenues certainly to be collected, and therefore is in the nature of a previous appropriation of funds subsequently to reach the treasury, the setting apart a portion thereof for a specified purpose, rather than the creation of an indebtedness against the state.

III.   In so far then as the act authorizes the issuance of warrants or certificates in anticipation of taxes to be collected during a biennial period and to cover any deficiency therein

4. SAME: capitol extension appropriation: construction of statute.

to meet expenses incurred in executing its purposes, not exceeding $250,000, it ought not to be denounced as inimical to the provisions of the Constitution quoted.   If the last four sections of the act were to be construed as plaintiffs contend these should be, however, a different conclusion would necessarily follow.   They say that these authorize the executive council to anticipate the taxes to be levied during the entire ten years amounting in the aggregate to over $2,200,000, $1,200,000 of which must be collected after the first biennial period:   Were it to be so construed, the limit of $250,000 might be exceeded, and unless the principle which governed in *Swanson v. City of Ottumwa*, 118 Iowa, 161, shall obtain, this would be in violation of section 2 of article 7 of the Constitution.   There, the city was authorized to levy a tax annually for a series of years out of which to create a sinking fund for the purpose of the purchase or erection of a system of waterworks, and in order to meet the present cost, to create a specific fund, by issuing bonds payable only from said sinking fund, from which and the sinking fund on hand to pay the contract price for the erection and completion of said system of waterworks.   For the payment of these bonds with interest "shall be pledged the entire proceeds of the two mills sinking fund tax, . . . and so much of the proceeds of the water rates and rentals collected from consumers and of the water tax . . . as shall not be needed for maintenance and operation, repairs and proper and necessary exten-

sions, additions and improvements of said waterworks.'' The plan was approved by a vote of the electors, a contract entered into, and the city was about to issue bonds such as contemplated, when suit was instituted to enjoin the issuance of the bonds for that, as was claimed, the indebtedness of the city then equaled the constitutional limit and such bonds would create a debt within the meaning of section 3, art. 11, of the Constitution, declaring that ''no county or other political or municipal corporation shall be allowed to become indebted in any manner, or for any purpose, to an amount in the aggregate, exceeding five per centum on the value of the taxable property within such county or corporation.'' On great consideration, the bonds were held not to create a ''debt'' such as contemplated in the above section; the court, after an exhaustive review of the authorities, saying:

Were we to give the word 'debt' the broad significance that some of the authorities would justify, we should destroy the corporate life and efficiency of every municipality which reached the allowed limit of indebtedness. But the construction we give it has strong support in the decisions of the courts of other states, is in strict line with the opinion we have heretofore frequently expressed, and preserves the integrity of the constitution according to its evident meaning and intent, while entailing no disastrous consequences to the city or to its citizens. The right of a city to construct and own works of public utility, if such rights exist, is one of great importance, and should not be embarrassed or rendered nugatory by strained or technical construction of the constitution or of the statutes. Its importance is not so much in the fact that public ownership is in itself wise or desirable (concerning which there may be much difference of opinion) as in the fact that with such power in reserve municipalities are placed in position to deal with private owners on equal terms, and avoid exactions which their helplessness might otherwise invite.

That case is readily distinguishable from that now before us. After the bonds were issued and the system of waterworks purchased or erected, the municipality would have no escape from the levy and collection of the taxes stipulated and

the application thereof to the satisfaction of the bonds and interest. In this case, however, the action of one General Assembly is not binding on its successor unless so declared in the fundamental law, and, though the Thirty-Fifth General Assembly did enact these statutes relating to the extension of the state capitol grounds, the succeeding General Assemblies are in no manner inhibited from repealing them. Indeed, it will be within the power of the next General Assembly, or any of its successors, if so disposed, not only to repeal chapter 14 of the acts of the Thirty-Fifth General Assembly in its entirety but to dispose of the property acquired thereunder. It is said that the holders of the certificates or warrants take that risk, as these are payable only from the taxes provided in the act. But this is so with every state debt. Though the debt created may constitute a legal obligation, no remedy exists for its enforcement, unless possibly held by another state, except as the state may permit, and necessarily the holder must rely upon payment at the option of the state from the only resource available, i. e., taxation. *State v. Young,* 29 Minn. 474 (9 N. W. 737). Being nonenforceable, such a debt is akin to a moral obligation, and, though condemned as in violation of good morals and as against sound public policy, no one has ever questioned the power of a state to repudiate its debts. A subsequent Legislature might repeal chapter 14, and this would leave the certificate without a fund from which to be paid; but it is scarcely conceivable that, after having received the proceeds of the certificates and made use of them for its own purposes, the state would deem the denial of any obligation to repay as consistent with the honor and integrity of a great people. Moreover, section 5 of article 7 of the Constitution prescribes how a debt exceeding $250,000 shall be created and paid: (1) For some single work or object; (2) to be paid with interest from an annual tax within twenty years; and (3) applied only thereon. The particular method of creating a fund out of which the state debt, authorized by a vote of the people, shall be paid, is precisely like that con-

templated in this act and approved in the *Swanson* case. The only possible distinction between the statutory method of providing for the payment of municipal bonds and the constitutional method of providing for the payment of a state debt, voted by a majority of the people, is that, under the former, the bonds are expressly made payable from the sinking fund created by the levy and collection of the taxes authorized only while under the latter the limitation of payment therefrom only is plainly to be implied. The Constitution having particularly prescribed the manner of raising a revenue out of which a debt of the state shall be satisfied, an obligation for an object such as defined in the Constitution and to be dis-charged as therein directed ought not to be denominated as other than a debt of the state.

Nor do we find the weight of authority otherwise. Section 10 of article 7 of the Constitution of New York, though differing some, is in substance like section 2 of article 7, and is in words following: "The state may, to meet casual deficits or failures in revenues, or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time, exceed one million of dollars; and the money arising from the loans creating such debts, shall be applied to the purpose for which they were obtained, or to repay the debt so contracted, and to no other purpose whatever." Section 12, art. 7, Const. 1846 (section 4, art. 7, Const. 1894) is, in all essential particulars, like section 5 of our article 7, and the Court of Appeals, in *Newell v. People,* 7 N. Y. 11, declared an act authorizing the creation of a fund by the sale of canal revenue certificates for the enlargement and completion of the Erie, Genesee Valley, and Black River Canals and the payment of these from revenue to be derived from taxation during twenty-one years void as creating a debt in excess of the limitation contained in the section quoted.

Article 12 of the Constitution of North Dakota declares that "the state may, to meet casual deficits, or failure in rev-

enue, or in case of extraordinary emergencies, contract debts but such debts shall never in the aggregate exceed the sum of two hundred thousand dollars," with provisions like those contained in sections 4 and 5 of article 7 of our Constitution following. In *State v. McMillan*, 12 N. D. 280 (96 N. W. 310), the Supreme Court of that state, speaking through Young, C. J., declared an act of the Legislature authorizing the issuance of bonds for the construction of school buildings and payable in the future out of funds derived from the sale of lands set apart for the schools a state debt and, as that outstanding equalled the limit fixed by the Constitution, the act was held to be in violation thereof; the court following *Newell v. People, supra*.

Section 5 of article 9 of the Constitution of Minnesota reads:

For the purpose of defraying ordinary expenditures, the state may contract public debts, but such debts shall never, in the aggregate, exceed $250,000; every such debt shall be authorized by law, for some single object, to be distinctly specified therein; and no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the Legislature, to be recorded by yeas and nays on the journals of each house respectively; and every such law shall levy a tax annually sufficient to pay the annual interest of such debt, and also a tax sufficient to pay the principal of such debt within ten years from the final passage of such law, and shall specially appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation and taxes shall not be repealed, postponed or diminished until the principal and interest of such debt shall have been wholly paid.

In *Brown v. Ringdal*, 109 Minn. 6 (122 N. W. 469), the Supreme Court of that state upheld an act authorizing the issuance of interest-bearing certificates of indebtedness, as funds were needed for the construction of a new state prison costing $2,250,000, said certificates to be payable out of a

fund produced by the levy and collection of taxes amounting to $225,000 per year, following *Flecten v. Lamberton,* 69 Minn. 187 (72 N. W. 65), the court saying:

Counsel for plaintiff differentiates the Lamberton case by the fact that no certificates of indebtedness were there authorized to be issued, and earnestly insists that this feature of the act under consideration renders it wholly void. We are unable to concur in this claim. The certificates in and of themselves create no indebtedness against the state. On the contrary, they are mere evidence of the holder's right to demand and receive 'from the State Treasurer the proceeds of the tax authorized by the act to be levied and collected, and known and classified as the Prison Building Fund.' Fairly construed, the act contemplates their payment from this fund exclusively, and they are not general obligations of the state. Whatever indebtedness, if any, was created by this act, is, within the *Lamberton* case, found in the provisions thereof appropriating $2,250,000 for the construction of the new prison and the levy of a tax extending over a period of nine years to produce the same, and not by the issuance of certificates indebtedness evidencing the right of the holders thereof to the fund when collected. If the certificates could be construed as creating an indebtedness against the state payable from the general revenue fund, a different question would be presented. But they are not. They are to be issued in anticipation of funds provided for and appropriated, rightfully under the *Lamberton* case, and are valid only as respects that fund when paid into the state treasury.

The majority intimate that but for the prior decision a different conclusion might be reached, but the act considered in the former case merely appropriated any surplus thereafter in the state treasury and the proceeds of an annual levy of two-tenths of a mill upon the assessed valuation of the state for not exceeding ten years to the purchase of a site and the erection of a capitol building at a cost of not exceeding $2,000,000. It in no manner contemplated the creation of a debt nor authorized the revenues to be anticipated by the issuance of evidence of debt. It might have been repealed by any

subsequent Legislature, but, of course, was the law of the state until repealed in authorizing the levy and collection of this like other taxes. This was pointed out by Lewis, J., in his dissenting opinion in the *Brown* case, adding:

The majority hold that the Legislature may provide for the present capitalization of such future conditions by issuing certificates of indebtedness to draw interest to be sold to the public upon the assurance that the credit of the state is behind them, and that the money will be forthcoming when the certificates mature. By this arrangement the entire amount of the tax levy is anticipated, and the amount is available for present purposes. Thus the evidence of a present indebtedness is furnished which may be received with confidence in the commercial world.

The opinion in *Flecten v. Lamberton, supra,* does not disclose that the point now being considered was involved, and as the court in *Brown v. Ringdal, supra,* gave the question scant, if any, consideration, the latter decision is not persuasive authority. Moreover, in that state a debt in excess of the limit may be authorized by a two-thirds vote of the members of each House of the General Assembly, and whether the act for the construction of the prison was so passed does not appear.

California adopted a Constitution in 1849, article 7 of which provided that the "Legislature shall not in any manner create any debt or debts, liability or liabilities, which shall singly, or in the aggregate, with any previous debts or liabilities exceed the sum of three hundred thousand dollars." Then follows an exception in case of war, invasion, or insurrection, similar to section 4 of article 7 of our Constitution, and provisions for the creation of a debt exceeding that amount like section 5 of that article. In *People v. Pacheco,* 27 Cal. 175, the Supreme Court of that state, speaking through Sawyer, J., held an act of the Legislature, in substance agreeing to pay the interest on $1,500,000 of bonds issued by the Central Pacific Railway Company for a period of twenty

years and directing that an annual tax of 8 cents on the
$1,000 taxable property of the state for that purpose, any
deficiency to be paid from the general fund on hand; and in
consideration thereof, the company undertaking to carry pub-
lic messages, lunatics and convicts to and from asylums and
prisons, materials for the construction of the state capitol, and
munitions of war without other compensation. The preamble
indicated it was a war measure, and the court upheld it as
such. But it also declared that, though the state was indebted
beyond the constitutional limit, the act did create a "debt"
within the meaning of the article a part of which we have
quoted. In doing so, the court, after full consideration, con-
cludes:

Here is a provision for raising a fund and setting apart
and appropriating it to the payment of the interest on the
bonds in question, more specific than those in the cases of
*State* v. *McCauley*, 15 Cal. 429, *McCauley* v. *Brooks*, 16 Cal.
24, and *Koppikus* v. *State Capital Commissioners*, 16 Cal. 249,
because in those cases the payment was to be made, generally,
out of 'moneys in the treasury not otherwise appropriated,'
without providing any specific fund and devoting it to that
use alone, or knowing whether or not there would in fact be
any unappropriated moneys in the treasury at the time pay-
ments would fall due. In this case, a specific fund is pro-
vided and set apart, to be devoted to the payment of the inter-
est in question alone; and it would seem to be more than
ample for the purpose, as the tax provided for on a sum much
less than the present assessed valuation of the taxable prop-
erty in the state, would produce the required amount, and the
appropriation from the general fund will not be required until
the specific fund is exhausted, which may, and in all probabil-
ity never will, occur. For these reasons there would be even
less propriety in holding this appropriation to be a debt or
liability, within the meaning of the constitutional restriction,
than those which were the subjects of discussion in the cases
cited. The Legislature has provided a fund, and made the
appropriation for the entire amount. No further legislation
is required upon the subject. Nothing further remains to be
done on the part of the state, but the ministerial duty of col-

lecting taxes and paying the interest out of the proceeds, as it from year to year accrues. Of course the state cannot, without a breach of good faith, refuse through its officers to perform this ministerial duty.

An examination of the earlier cases relied upon discloses that, while the contracts entered into extended beyond the time for which taxes were available, no liability was created in excess of that which would be in the treasury to meet it. No attention was given the thought that the scheme was like that provided in the article for the creation of an indebtedness in excess of the amount limited. The court appears to have relied largely on *State v. Medberry,* 7 Ohio St. 526; but there the decision was that the state might anticipate the revenues to be collected within the biennial period for which the General Assembly may authorize the levy and collection of taxes, and, as a clause in the Constitution forbade appropriations for more than two years, the act authorizing a contract extending over a period of five years was denounced as invalid.

For the reasons already stated, we are not inclined to follow the California decisions. To do so would defeat the manifest design of the people in adopting the section of the Constitution in limiting indebtedness the General Assembly may create. The salutary purpose was to prevent mortgaging the revenues of the state in the future, beyond a specified amount, and, if this is to be rendered effective, it is quite as essential to denounce a scheme to incur a debt for the payment of which provision is made by a scheme of taxation as a debt to the payment of which no thought has been given. In either event, the funds to meet the obligation must be raised by taxation, and, in either, it is certain to be paid.

The decision in *Swanson v. City of Ottumwa, supra,* then is not controlling, and, were the act to be construed as authorizing the issuance of certificates payable from taxes levied beyond the biennial period exceeding $250,000, it would have

to be denounced as inimical to section 2 of article 7 of the Constitution.

IV.  The last four sections of the act then are valid, if they may be construed as authorizing the issuance of certificates in anticipation of taxes to be levied and collected in the biennial period during the period of such issue and for any deficiency beyond this to meet the expenses incurred in pursuance of the first eight sections not exceeding $250,000.  If, however, the act must be construed as conferring authority to issue certificates to cover such deficiency in excess of such amount, the last four sections must be denounced to be inimicable to the fundamental law.  The test, as contended by plaintiffs, is not what has been or may be done under the act, but what is authorized to be done in pursuance thereof. As said in *City of Beatrice v. Wright,* 72 Neb. 689 (101 N. W. 1039): "The vital point to be determined is: What is authorized to be done?  The constitutional validity of the law is to be tested, not by what possibly has been or may be done under it, but what can be done under and by virtue of its provisions, and in the light of the Constitution."  The members of the General Assembly which enacts and the Governor who approves, a statute have sworn quite as solemnly to support the Constitution as the members of this court and are to be assumed to have intended to conform their conduct with such obligation.  If then two constructions are open and possible without doing violence to the language of the act, one upholding the act as not in violation of the Constitution and the other denouncing it as inconsistent therewith, the courts should assume that the lawmakers intended the former and so construe the language thereof as to render it harmonious with the fundamental law.  This is in accord with the rule that only when clearly and palpably in violation of some provision of the Constitution will a statute be denounced as inimicable thereto.

5.  SAME: Constitutional law: construction of statutes.

In *McCullough v. Virginia,* 172 U. S. 112 (19 Sup. Ct. 138, 43 L. Ed. 382), the principle is well stated:

It is elementary law that every statute is to be *read in the light* of the constitution. However *broad* and *general its language,* it cannot be interpreted as extending beyond those matters which it was within the constitutional power of the Legislature to reach. It is the same rule which obtains in the interpretation of any private contract between individuals. That, whatever may be its words, it is always to be considered in the light of the statute, of the law then in force, of the circumstances and conditions of the parties. So, although general language was introduced into the statute of 1871, it is *not to be read* as reaching to matters in respect to which the Legislature had no constitutional power, but only as to those matters within its control and if there were, as it seems there were, certain special taxes and dues which under the existing provisions of the state constitution could not be affected by legislative action, the *statute is to be read as though it in terms excluded* them from its operation.

Again, in *Chesapeake & Ohio Ry Co. v. Kentucky,* 179 U. S. 388, 394 (21 Sup. Ct. 103, 45 L. Ed. 244) :

Indeed, we are by no means satisfied that the Court of Appeals did not give the correct construction to this statute in limiting its operations to domestic commerce. It is scarcely courteous to impute to a Legislature the enactment of a law which it knew to be unconstitutional, and if it were settled that a separate coach law was unconstitutional, as applied to interstate commerce, the law applying *on its face to all passengers* should be *limited to such as the Legislature were competent to deal with.* The Court of Appeals has found such to be the intention of the General Assembly in this case, or, at least, that if such were not its intention, the law may be *supported* as applying *alone to domestic commerce.* In thus holding the act to be severable, it is laying down a principle of construction from which there is no appeal.

Reverting to the terms of the act, it will be noted that, from the capitol grounds and extension fund, the executive

council may purchase the lands included in the plat ''from time to time, within said period'' (section 2) ''on option or contracts or any other way which said council may deem expedient . . . at any time within said period of ten years'' (section 4). When the several tracts are to be acquired for the state is entirely within the discretion of the executive council. ''For the purpose of accomplishing the earliest possible completion of the work contemplated herein and the carrying out the plan provided for in this act, the executive council may anticipate the collection of the taxes here authorized, . . . may issue interest-bearing warrants or certificates'' payable from the contemplated fund ''each running not more than ten years.'' Section 9. The executive council may but is not bound to complete the work at the earliest moment. It may but it is not bound to issue certificates. If it so elects, the entire ten years may be taken within which to acquire the land. Even if it should elect to purchase all of that included in the plat, not owned by the state, immediately the evidence is without dispute, that this can be accomplished from the funds available from the taxes to be levied and collected for the years 1913 and 1914 together with the proceeds of certificates not exceeding $250,000 in amount. Surely then the act ought not to be construed as authorizing the creation of a ''debt'' in excess of the limitation contained in section 2 of article 7 of the Constitution. Even if this would not suffice, it is not to be assumed that the executive council would issue certificates exceeding such limit. Every act of the General Assembly is to be read in the light of the Constitution, and the limitations contained therein are as effective as though written into the legislative act. The judiciary is not the only department of government upon which the duty of observing and obeying the provisions of the Constitution devolves. Each of the other departments, legislative and executive, are under precisely the same obligation to know these and obey, and it ought not to be said that such obligation rests more lightly on the one than on the other. All are representatives of the

people with different functions to perform, and though the courts are by the Constitution itself made the final arbitrators, in construing its terms and interpreting its meaning, it is never to be lost sight of that, until the contrary appears beyond reasonable doubt, the courts will proceed on the theory that the legislative and executive departments have obeyed its commands and will yield to its injunctions. With the wisdom or expediency of legislation, the courts as such have no concern. Their duty is to construe, apply, and interpret the law, not to enact it, and in so doing we conclude that, when construed in connection with the provisions of the Constitution, the act under consideration cannot be said to authorize the executive council to violate any of its provisions, and, in our opinion, the district court erred in construing any portion of the act as unconstitutional.—*Reversed.*

All the Judges concur.