[Civ. No. 23182. Third Dist. Mar. 16, 1984.]

POOLED MONEY INVESTMENT BOARD, Petitioner, v.
JESSE UNRUH, as State Treasurer, Respondent.

**COUNSEL**

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, N. Eugene Hill, Assistant Attorney General, Geoffrey L. Graybill and Walter J. Wiesner, Deputy Attorneys General, for Petitioner.

C. Richard Walker, Edward B. Rogin, Stanley J. Dirks, Robert E. Freitas, David P. Granoff and Orrick, Herrington & Sutcliffe, for Respondent.

**OPINION**

**PUGLIA, P. J.—**  This case presents the question whether recently enacted statutory authorization for state borrowing of money to be expended

for any authorized General Fund purpose transgresses the $300,000 limitation on state indebtedness imposed by article XVI, section 1, of the California Constitution. We hold that it does.

Petitioner Pooled Money Investment Board (Board) consists of the Controller, Treasurer, and Director of Finance of the State of California. (See Gov. Code, § 16480.1.) By majority vote of the Controller and Director of Finance, the Board adopted resolutions directing respondent Jesse Unruh, as Treasurer, to issue and sell up to $150 million in commercial paper notes and up to $150 million in bank credit notes representing moneys borrowed by the state in fiscal year 1983-1984. The Treasurer refuses to comply with the directive upon the advice of counsel that serious legal questions exist regarding the validity of Government Code sections 17281-17294, which purport to authorize the state to undertake such borrowing. In this mandamus proceeding, the Board seeks a peremptory writ of mandate compelling the Treasurer to comply with the resolutions adopted pursuant to the authorizing statutes. The petition was originally filed in the Supreme Court which ordered it transferred to this court. We issued an alternative writ.

Enacted as urgency measures in 1983 (Stats. 1983, First Ex. Sess., ch. 10, §§ 4, 70, eff. Feb. 17, 1983; Stats. 1983, ch. 323, §§ 58.1, 158, eff. July 21, 1983), Government Code sections 17281-17294 reflect the Legislature's attempt to resolve an admittedly serious cash flow problem.[1] The enabling legislation sanctions the issuance and sale of notes or other short-term instruments as authorized by the Board upon the written request of the Governor. (See Leg. Counsel's Dig. of Assem. Bill No. 28 (1983 First Ex. Sess.).) The state may borrow money "[o]n or after the date on which the budget of any fiscal year has been adopted" and the money so borrowed may "be used and expended by the state for any General Fund purpose for which the state is authorized to expend moneys during the fiscal year." (Gov. Code, § 17281. All subsequent citations to sections of an unspecified code are to the Government Code.) The aggregate amount of borrowed moneys, represented by the principal amount of notes outstanding at any one time, is limited to "10 percent of the General Fund revenues as set forth in the annual report by the Controller to the Governor . . . ." (§ 17287.) No note "shall be payable later than the last day of the fiscal year for which the budget has been adopted, or be renewable beyond that date. . . ." (§ 17284) "Any revenues in the General Fund during the current fiscal year are available for the payment of all notes and the interest thereon until they are fully paid and discharged." (§ 17285).

---

[1] A sunset provision repeals the legislation effective June 30, 1985, unless a later enactment provides otherwise. (Gov. Code, § 17294.)

The statute does not require that the notes in fact be paid in the fiscal year in which they are issued. Section 17284 authorizes the payment of interest on the principal sum owing on the notes after their maturity. Section 17293 appropriates the "sum annually as will be necessary to pay the principal of and the interest on the notes . . . ."[2]

Pursuant to the authority conferred by section 17283, the Board on June 7, 1983, adopted Resolutions N-1 and N-2. Resolution N-1 authorizes the

---

[2]The relevant Government Code sections provide in full:

Section 17281: "On or after the date on which the budget for any fiscal year has been adopted, the state may borrow money pursuant to this chapter, and the borrowing shall be represented by notes or other short-term instruments issued pursuant to this chapter. Money so borrowed may be used and expended by the state for any General Fund purpose for which the state is authorized to spend moneys during the fiscal year."

Section 17282: "The notes shall be issued pursuant to a resolution authorizing the issuance thereof adopted by the committee provided for by Section 17283. Notes authorized to be issued may be issued from time to time as provided in the resolution. The resolution shall set forth the form and manner of execution and offering of the note or notes. Upon written request of the Governor, the committee may authorize the Treasurer, upon the terms and conditions fixed by the committee, to issue notes, on a negotiated or a competitive bid basis."

Section 17283: "The committee authorized to issue notes under this chapter shall be the Pooled Money Investment Board."

Section 17284: "Any note issued under this chapter may be negotiable, may be payable to order or to bearer, may be in any denomination, and may bear interest at a rate or rates to be determined as provided by the resolution and payable as provided therein. Any note may be made payable on a fixed date or upon demand of the holder of the note, and may be made subject to prepayment or redemption at the option of the state or at the option of the holder, but no note shall be payable later than the last day of the fiscal year for which the budget has been adopted, or be renewable beyond that date. The notes may contain a provision for the payment of interest on the principal of the notes after maturity at the rate provided in the note. The notes shall not bear interest on unpaid interest either before or after maturity."

Section 17285: "Any revenues in the General Fund during the current fiscal year are available for the payment of all notes and the interest thereon until they are fully paid and discharged."

Section 17286: "Notwithstanding Section 17285, any note issued pursuant to this chapter shall be a general obligation of the state, and, to the extent not paid from the revenues pledged for the payment thereof, shall be paid with the interest thereon from moneys in the General Fund or any other moneys of the state lawfully available therefor."

Section 17287: "The aggregate amount of notes, as determined from their principal amount, issued pursuant to this chapter and outstanding at any one time shall not exceed 10 percent of the General Fund revenues as set forth in the annual report by the Controller to the Governor required by Section 12460. The annual report referred to in this section shall be the most recent report submitted by the Controller to the Governor as of the commencement of the fiscal year in which the notes may be issued."

Section 17293: "There is hereby appropriated from any unapplied money, as defined in Section 17220, in the General Fund for the purposes of this chapter, an amount as will equal the following: "(a) The sum annually as will be necessary to pay the principal of and the interest on the notes issued and sold pursuant to the provisions of this chapter, as the principal and interest become due and payable. "(b) The sum as is necessary to carry out the provisions of Section 17292, which sum is appropriated without regard to fiscal years."

Section 17294: "This chapter shall remain in effect only until June 30, 1985, and on that date is repealed unless a later enacted statute deletes or extends that date."

issuance of up to $150 million in commercial paper notes and up to $150 million in bank credit notes for the fiscal year commencing July 1, 1983. It provides that general fund revenues during fiscal year 1983-1984 shall be available for payment of the notes and interest thereon subject to the prior application of such money (1) to support the public school system and public institutions of higher education, (2) to pay the principal and interest on general obligation bonds of the state, and (3) to reimburse special funds of the state for moneys advanced or transferred from such special funds to the general fund. The commercial paper notes shall be tax exempt and bear interest at a rate not exceeding 9 percent per annum. As a security device, bank credit notes shall be issued and sold, pursuant to a "revolving credit agreement" with one or more banks when necessary to provide for payment of the commercial paper notes or the bank credit notes and the interest thereon as those notes mature. The bank credit notes shall bear interest equal to a percentage of the prime rate as provided by the revolving credit agreement.

Resolution N-2 was adopted upon the written request of the Governor. It implements the first resolution and directs the Treasurer to issue and sell the notes as authorized for the fiscal year 1983-1984. The Treasurer, as a member of the Board, voted against both resolutions, and his present refusal to carry out the majority's directive brings the controversy to a head before this court.

Except in cases of war, section 1 of article XVI of the California Constitution prohibits the Legislature from creating, in any manner, state debts or liabilities which exceed the sum of $300,000 without a vote of the people.[3] As the resolutions under consideration here authorize the state to "borrow" up to $300 million for purposes unrelated to war without the prior approval

---

[3]The pertinent language of section 1 of article XVI is as follows: "The Legislature shall not, in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or liabilities, exceed the sum of three hundred thousand dollars ($300,000), except in case of war to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work to be distinctly specified therein which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within 50 years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged, and such law may make provision for a sinking fund to pay the principal of such debt or liability to commence at a time after the incurring of such debt or liability of not more than a period of one-fourth of the time of maturity of such debt or liability; but no such law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election; and all moneys raised by authority of such law shall be applied only to the specific object therein stated or to the payment of the debt thereby created. . . ."

of the electorate, the question posed is whether implementation of the statutory authority to borrow this sum of money would create a debt within the meaning of the constitutional prohibition. If so, the borrowing scheme is constitutionally invalid regardless of the seriousness of the state's financial situation or the economic benefits associated with the use of short-term, tax-exempt financing instruments. ■ The Constitution is the supreme law of the state and neither transient urgency nor abstract practicality can override it.

The mandate of article XVI, section 1, has remained unchanged since its original inclusion in the Constitution of 1849. Referring to what was then article VIII, the Supreme Court stated: "The language of the article . . . is too clear and explicit to admit of but one interpretation. In fact, it would defy the ingenuity of the most subtle intellect to invent a consistent interpretation, other than that which naturally suggests itself from the words of the Article. It is without ambiguity, and expressly forbids the Legislature from creating a debt of more than three hundred thousand dollars, in any way, unless the same is left to the vote of the people. So plain is the meaning of the language, that it is scarcely worth while to invoke rules of construction, . . ." (*The People* ex rel. *The Attorney General* v. *Johnson* (1856) 6 Cal. 499, 500-501, disapproved on other grounds in *People* ex rel. *Deukmejian* v. *Brown* (1981) 29 Cal.3d 150, 159 [172 Cal.Rptr. 478, 624 P.2d 1206].)

Even if the meaning of the article's language were in doubt, debates of those convened to frame the Constitution ". . . plainly evidence the fact, that the Convention thought the revenue of the state would be equal to its expenditures; but as some doubts existed upon this point, it was proposed to allow a margin of three hundred thousand dollars over and above the revenue; if this should prove to be insufficient, then the constitutional limit having been exhausted, the power of taxation and appropriation returned to the people, who might determine, through the medium of an election, for or against appropriations." (*Johnson, supra,* 6 Cal. at pp. 502-503.) The framers were "mostly men fresh in the experience of the errors into which other states had fallen. They had witnessed the unhappy results that followed extravagant legislation, and were anxious to rear a bulwark here, which would protect us against similar disasters." (*Id.,* at p. 503.)

Despite the *Johnson* court's straightforward characterization of the constitutional debt limitation, later cases have approved borrowing methods which, although appearing to create a debt or liability, are saved from constitutional infirmity by the "appropriation doctrine." ■ That rule generally provides that an obligation for which an appropriation is made at the time of its creation from existing funds, or reasonably anticipated funds

subject to appropriation, is not within the constitutional limitation on indebtedness (see Annot. (1934) 92 A.L.R. 1299, 1302). A review of the California cases which have applied this judicially developed rule convinces us that it cannot be applied to the facts of this case without circumventing the constitutional mandate.

An early California decision in the development of the appropriation doctrine is *People* v. *Pacheco* (1865) 27 Cal. 175. There the court considered whether a law authorizing the Central Pacific Railroad Company to issue bonds and obligating the state over a period of 20 years to pay a certain portion of the interest in an amount exceeding $300,000 violated the constitutional debt limitation. The law also levied a special tax and appropriated the proceeds into a special fund from which the interest coupons were to be paid. The court reasoned that where an appropriation is made to discharge an obligation, even though there are insufficient moneys in the treasury at the time the appropriation is made, the transaction is no different from a cash payment so long as sufficient anticipated revenues will be available at the time payment becomes due. (At p. 218.) Said the court: ". . . a specific fund is provided and set apart, to be devoted to the payment of the interest in question alone; and it would seem to be more than ample for the purpose . . . The Legislature has provided a fund, and made the appropriation for the entire amount. No further legislation is required upon the subject." (At p. 220.) The whole is regarded as a single financial transaction; the anticipated revenue deemed constructively in the treasury and the appropriation balance each other so that there is no debt or liability in contemplation of law. (*Pacheco, supra,* at p. 218; see also cases collected in Annot., *supra,* 92 A.L.R. 1299; Annot. (1941) 134 A.L.R. 1399.)

In *Veterans' Welfare Board* v. *Jordan* (1922) 189 Cal. 124 [208 P. 284, 22 A.L.R. 1515], the Supreme Court significantly limited the appropriation doctrine as expounded in *Pacheco, supra,* 27 Cal. 175. Before the court was a statute authorizing the issuance of $10 million in interest-bearing bonds to assist World War I veterans purchase farms and homes. It was argued that the issuance of the bonds did not create a debt since at the time of the statutory authorization the Legislature had appropriated funds to service the bonded indebtedness. (At p. 128.) The court distinguished *Pacheco,* pointing out that it did not deal with a single indebtedness evidenced by bonds of the state, but with annually accruing interest payments on private corporate bonds to be paid from funds generated by an annual tax levy specifically appropriated for such purpose. (*Veterans' Welfare Board* v. *Jordan, supra,* 189 Cal. at pp. 130-131, 134.) Stressing the limited application given the appropriation doctrine throughout the United States (at p. 134, citing inter alia, *Rowley* v. *Clarke* (1913) 162 Iowa 732 [144 N.W. 908]; see also 92 A.L.R. 1299 and 134 A.L.R. 1399, *supra*), the *Jordan* court

rejected the contention that the issuance of bonds pursuant to an authorizing law which appropriates money, or provides ways and means, for their payment for that reason does not create an indebtedness. (189 Cal. at pp. 135-136; see also *Nougues* v. *Douglass* (1857) 7 Cal. 65.) The court noted that under the constitutional exception permitting a debt in excess of $300,000 when ratified by the people, there also must be provision, exclusive of loans, for repayment of the indebtedness. (See Cal. Const., art. XVI, § 1, *ante,* p. 159, fn. 3; *Jordan,* 189 Cal. at p. 128.) The court concluded that if "no debt against the state is created within the meaning of the constitution where ways and means are provided at the time of the creation of the debt for its payment, this section of the constitution, in effect, would read: The legislature shall not create any debt, where such indebtedness is in excess of $300,000, except by law which does not create a debt and except where the people have approved such indebtedness." (*Jordan,* at p. 128.)

During the Great Depression, the Supreme Court invoked the appropriation doctrine to uphold the use of registered warrants authorized by Chapter 605 of the Statutes of 1933 (now codified in sections 17200-17224) as a means of dealing with fiscal crisis. In *Riley* v. *Johnson* (1933) 219 Cal. 513 (*Riley* I), the court upheld the registration and deferred payment of interest-bearing warrants exceeding in the aggregate $300,000 at a time when there were no unapplied moneys in the general fund to meet the payment of either the principal or interest thereon because the Legislature, at the time of authorizing the registered warrant procedure, had appropriated money to meet their payment. (At pp. 520-521.) Relying principally on *Pacheco* and its predecessors, the court said: "It is well settled in this state that revenues may be appropriated in anticipation of their receipt just as effectually as when such revenues are physically in the treasury. The appropriation of such moneys and the issuance of warrants in anticipation of the receipt of revenues in effect operates in the nature of a cash payment and, therefore, does not create an indebtedness or liability within the meaning of the debt limitation clause." (At pp. 520-521.) In *Riley* v. *Johnson* (1936) 6 Cal.2d 529 (*Riley* II), the court extended the holding of *Riley* I to situations where the warrants probably would not be paid until the succeeding fiscal period. (At p. 532.) Despite the delay, the court found the transaction to retain its character as a cash payment because appropriations are not restricted to any fiscal period and the Legislature may not repeal or render ineffectual appropriations to pay registered warrants as against the contractual rights of warrant holders. (At p. 532, relying on *People* v. *Bond* (1858) 10 Cal. 563, 571 [an impairment of contracts case].)

In *Flournoy* v. *Priest* (1971) 5 Cal.3d 350 [95 Cal.Rptr. 793, 486 P.2d 689], the Supreme Court upheld the validity of a statutory scheme (Stats. 1971, ch. 223, § 2) providing " 'an additional means of temporary borrow-

ing to meet cash flow needs, and avoid more costly registered warrants. . . .' " (At p. 351.) "Chapter 223 was enacted to meet the practical problem created by the fact that the collection of state revenues within the fiscal year 1971-1972 [would] lag behind the expenditures required by appropriations for that year, . . ." (At p. 352.) In finding no constitutionally relevant distinctions between chapter 605, upheld in the *Riley* cases, and the statutory provisions before it, the court observed: "[C]hapter 605 provided that if there were insufficient funds in the treasury to pay warrants drawn by the Controller, the Treasurer should register such warrants and provide that they should bear interest at the rate of five percent per annum. The warrants were then delivered to the payees thereof and were thereafter payable when sufficient funds became available in the treasury . . . [T]he payment of interest was based on the appropriation for such interest contained in chapter 605, and . . . the payment of the principal of the warrants was based both on the appropriations of that chapter and *the appropriations for underlying expenditures involved.*" (At p. 352, italics added; see also current § 17221.) "Instead of providing for the issuance of numerous unpaid warrants on a haphazard basis," chapter 223 of the Statutes of 1971 provided "for an orderly procedure whereby the Controller estimates in advance the funds that will be needed to meet the current expenses of government. He then draws a demand or demands in that amount 'against appropriations made from the General Fund to be paid in the then current fiscal year prior to the receipt of [estimated probable income] . . .' and delivers the demands to the Treasurer. 'The State Treasurer shall register the same for nonpayment and notify the State Controller. The State Controller may then authorize the State Treasurer to issue and sell notes of the State of California representing said registered demand or demands. Such notes shall be issued only to provide cash in an amount sufficient to satisfy said' demands. (Gov. Code, § 17300.) . . . Government Code, section 17304, then provides for the payment of the notes with interest from moneys in the General Fund in the fiscal year of issuance, and section 17310 expressly appropriates the funds necessary to pay the principal and interest of the notes and necessary administrative expenses." (Fn. omitted; *Flournoy,* at p. 353.)[4]

Given the similarities between chapter 223 and the statute under consideration in *Riley* I and II, the *Flournoy* court concluded that the appropriation of revenues and issuance of notes in anticipation of their receipt operated "in the nature of a cash payment" and did not trigger the constitutional debt

---

[4]Chapter 223 of the Statutes of 1971 was codified as sections 17300-17310; it was repealed by Statutes 1977, chapter 579, section 72, page 1862. Almost identical provisions are found in new sections 17300-17312, adopted at the same time as the Government Code sections under review here. (See Stats. 1983, First Ex. Sess., ch. 10, § 5, eff. Feb. 17, 1983.)

limitation. (At pp. 353-354; quoting *Riley I, supra,* 219 Cal. at pp. 520-521; *Riley II, supra,* 6 Cal.2d at p. 532.)

In accord with the holding in *Jordan, supra,* 189 Cal. 124, application of the appropriation doctrine in *Riley* I and II and in *Flournoy* was not dependent simply on an existing appropriation for paying back borrowed moneys. The statutes approved there in common required the existence of an underlying appropriation for expenditures and an actual or expected cash deficit in the general fund resulting in insufficient money to pay those expenditures when they came due. The registration of a warrant (see § 17221) or a demand (see § 17300) was conditional upon the existence of an underlying obligation for payment of which moneys had already been appropriated. Without the existence of a specific item to be paid for which an appropriation had been made, the equivalent of a cash transaction could not be posited.

Also necessary to the rationale of *Flournoy* and the *Riley* cases was the constructive presence of anticipated revenues in the state treasury. Logically, borrowing to pay for an outstanding obligation can be equated with a cash transaction only if the appropriation for retirement of the loan instruments is based on probable or reasonably anticipated revenues. While *Riley* II establishes that the loan instruments need not be paid in full during the fiscal year of issuance, it is nonetheless clear that appropriations therefor must be based on sound and reasonable estimates of revenues expected to be forthcoming within a short period of time.[5] Furthermore, the statute considered in *Flournoy* authorizing issuance of shortterm notes specifically requires that appropriations for payment of the notes be based on estimates of probable income during the current fiscal year and that the notes "be payable exclusively from moneys in the General Fund in the fiscal year of issuance," except for "recourse to internal borrowing funds in the event insufficient moneys are available from the General Fund." (§§ 17300, 17304.)

■ Unlike the other borrowing authority reviewed here, sections 17281-17294 impose virtually no limitations on when and in what amount borrowing is authorized. Although borrowing may not occur before the budget for any fiscal year has been adopted, there is no requirement there be any actual or anticipated cash deficit in the general fund before borrowing can take place. Nor is authorized borrowing in any way tied to specific underlying appropriations to ensure that the aggregate amount borrowed

[5]Indeed, *Rowley* v. *Clarke, supra,* [144 N.W. 908], cited as authority in *Riley* II, seems to require "legal certainty" that revenues will reach the treasury before appropriations in anticipation of the receipt of those revenues can be treated as part of a cash transaction passing constitutional muster. (At p. 912.)

will not exceed existing appropriations for satisfaction of which there is a cash deficit. While it may be assumed that some expenditures for fiscal year 1983-1984 appropriations will encounter a cash deficit, those appropriations for which borrowing is permitted have not been identified as within that class. In fact, the only statutory limitation on the amounts which may be borrowed for such unspecified purposes is 10 percent of general fund revenues, whatever that figure may be.[6]

The lack of any nexus to underlying appropriations or to a deficit in general fund cash to meet expenditures for which those appropriations have been made differentiate transactions under the statute in question from those under other statutes which have been equated with cash payments. Any cash transaction requires two sides—an obligation and its payment. Since sections 17281-17294 provide only for the payment and do not identify the obligation or even require that one exist, an essential element of the equation is missing.[7]

Moreover, the statute in question does not prescribe when the borrowed sums and interest thereon are to be paid. Unlike the procedure authorized for registered demand notes (See § 17304), there is no requirement that these notes be paid in the fiscal year in which they are issued but only that they mature and be "payable" in the fiscal year of issuance. (See § 17284.) Although the statute contemplates issuance of shortterm instruments it also permits borrowing unrelated to current fiscal year appropriations and to probable forthcoming revenues. The Board admits that the necessity underlying the new legislation is a "continuing cash deficit," not merely a temporary lag of incoming revenues behind required expenditures.[8]

Despite the fact that the Legislature has appropriated funds to service the loans, the borrowing scheme contained in sections 17281-17294 lacks the

---

[6]If, as respondent points out, the last annual report by the Controller to the Governor required by section 12460 stated revenues in the General Fund in the amount of $19,842,217,676, the statute would authorize the state to incur an aggregate indebtedness of more than $1.9 billion. (See § 17287, fn. 2, *ante,* p. 158.)

[7]The declarations of Controller Kenneth Cory, Director of Finance Michael Franchetti, and Governor George Deukmejian state that the issuance of the notes is "necessary to enable the state to pay in a timely manner, without internal borrowing, the appropriations by the Legislature which are required to be paid in the current fiscal year." Regardless of the evidentiary value of these declarations, the inability to tie the borrowing to specific appropriations means that no "cash transaction," as such, can be identified.

[8]Even if the authority to borrow the sum of $300 million had been ratified by the people, the Constitution would also have required that it be authorized by law for "some single object or work to be distinctly specified" and all moneys raised by authority of such law to be "applied only to the specific object therein stated or to the payment of the debt thereby created. . . ." (Cal. Const., art. XVI, § 1.) It would anomolous to construe the open-ended borrowing at issue here, usable for any general fund purpose (see § 17281), as permissible under the Constitution *without* the vote of the people.

elements of a cash transaction necessary to avoid creation of a constitutionally repugnant debt or liability. As the appropriation doctrine is inapposite, the legislation and implementing resolutions involved here fatally conflict with the $300,000 debt limitation of article XVI, section 1, of the California Constitution and must be held invalid. Accordingly, petitioner is not entitled to a writ of mandate to compel the respondent Treasurer to issue up to $150 million in commercial paper notes and up to $150 million in bank credit notes.

The petition for peremptory writ of mandate is denied; the alternative writ is discharged.

Sparks, J., and Sims, J., concurred.