David M. STANLEY, Hilarius L. Heying, Cloyd Robinson, Jane A. Miller, Don Carver, Herbert A. Wilson, Edward D. Failor, Sr., Margaret Beals, Joann Fretner, John G. Giblin, Riley Gillette, Hugh S. Greig, Edwin A. Hicklin, Herbert H. Kersten, Marjorie E. Kreager, Donald P. Racheter, Donald H. Shaw, Jean Leu Stanley, Tom Vance, Keith L. Vetter, and C.H. Woodward, Appellants,

v.

Michael L. FITZGERALD, Treasurer of the State of Iowa, Appellee,

v.

Gretchen TEGELER, Director of the Department of Management, and Gerald Bair, Director of the Department of Revenue and Finance, Third–Party Appellees.

No. 96–1475.

Supreme Court of Iowa.

July 1, 1998.

William Sidney Smith, Ronald L. Mountsier and Stacey N. Bell of Smith, Schneider, Stiles, Hudson, Serangeli, Mallaney, Shindler & Scalise, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, Elizabeth M. Osenbaugh, Solicitor General, and Julie F. Pottorff, Deputy Attorney General, for appellee.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, for third-party appellees.

ANDREASEN, Justice.

David M. Stanley and other members of a group known as Iowans For Tax Relief (collectively "Stanley") appeal from a district court ruling dismissing their request for declaratory and injunctive relief. Stanley brought suit against Michael L. Fitzgerald, the State Treasurer, challenging the issuance of tax and revenue anticipation notes (TRANs). Stanley argued the manner in which the proceeds of the TRANs were used created debt in violation of article VII, section 2 of the Iowa Constitution. He also argued the State should be required to use Generally Accepted Accounting Principles (GAAP) to determine compliance with Iowa's constitutional prohibition against the state incurring contractual debt in excess of $250,-000. The district court concluded Stanley was not entitled to the relief he sought and dismissed his petition. On appeal we affirm.

I. *Background Facts and Proceedings.*

In July 1992, Stanley filed a petition for declaratory judgment and injunctive relief seeking to prevent the State from engaging in certain financial practices. The State moved for dismissal. After an expedited hearing the district court dismissed the suit. Stanley appealed and we reversed the order of the district court and remanded the case for further proceedings. *Stanley v. Fitzgerald,* 509 N.W.2d 454, 459 (Iowa 1993).

On remand the Treasurer filed a third-party petition to join Gretchen Tegeler, Director of the Department of Management, and Gerald Bair, Director of the Department of Revenue and Finance, on the basis that they were necessary to assure the relief sought by Stanley. Stanley did not assert any claims against the joined defendants.

The essence of Stanley's complaint involves the use of TRANs. Iowa Code sections 12.25

and 12.26 (1991) authorize the Treasurer to issue TRANs. TRANs are short-term financial instruments designed to level out the cash flow of the State. Iowa Code § 12.25. The State does not receive revenues in an even flow throughout the year. However, it is faced with expenses that must be paid regardless of the collection of revenue (*e.g.* payroll for State employees). To alleviate the problem the State sells notes based on anticipated revenues. *Stanley*, 509 N.W.2d at 456. The TRANs must be paid in full by the end of the fiscal year in which they are issued.[1] *Id.*; Iowa Code § 12.26. The purpose of the TRANs is to allow the State to pay its obligations in a timely fashion. Iowa Code § 12.25.

Stanley claims the State manipulated the budget and used TRANs to avoid incurring debt. Beginning in the 1990 fiscal year the State started issuing TRANs in increasing amounts. During the years in question the State issued TRANs in the following amounts:

Series 1990A—$280,000,000 due June 28, 1991

Series 1991A—$330,000,000 due June 30, 1992

Series 1992A—$375,000,000 due June 30, 1993

Series 1993A—$600,000,000 due June 30, 1994

At the same time it was issuing the TRANs, the State delayed paying school aid appropriations until the beginning of the following fiscal year. For example, instead of making payments of school aid appropriations in June 1990, the State delayed making the payments until after July 1.

Stanley claims each year when the new TRANs were issued part of the proceeds were used to pay the prior year's school aid appropriations which had been held over to the new fiscal year. He further alleges budget practices were adopted that accelerated the recognition of revenue and delayed the recognition of expenses. The net result of these practices, Stanley argues, was the creation of a "core" of constitutionally prohibited debt.

A two-day trial was held on November 20–21, 1995. The court issued an order on June 4, 1996, denying Stanley any relief and he appealed.

## II. *Scope of Review.*

The parties disagree on the standard of review for this matter. Initially, Stanley brought his action as a law action. However, he argues that the relief he requested was equitable in nature. He claims our review is de novo. The Treasurer argues the record demonstrates the action was tried at law with rulings by the district court on objections and therefore, our review is at law.

■ Our rules of civil procedure do not specify whether a declaratory judgment action is legal or equitable in nature. Ordinarily, whether a declaratory judgment action is a legal or equitable proceeding is determined by the pleadings, the relief sought, and the nature of the case. *Citizens Sav. Bank v. Sac City State Bank*, 315 N.W.2d 20, 24 (Iowa 1982). At trial objections were made by the parties and the court ruled on those objections. This indicates the matter was tried at law. We review a case on appeal in the manner it was treated at trial. *Bricker v. Maytag Co.*, 450 N.W.2d 839, 841 (Iowa 1990). Therefore, our review is at law.

■ Stanley has raised constitutional questions in this action. When constitutional questions are raised we make our own evaluation of the totality of the circumstances. *Norgard v. Iowa Dep't of Transp.*, 555 N.W.2d 226, 228 (Iowa 1996). We presume statutes to be constitutional and the challenging party "must show beyond a reasonable doubt that a statute violates the constitution and must negate every reasonable basis that might support the statute." *Id.*; *accord* Iowa Code § 4.4.

## III. *Did the Treasurer Violate the Debt Clause by Issuing the 1991 TRANs?*

On appeal Stanley has limited his arguments concerning the illegality of the TRANs to the Series 1991A TRANs. Article VII, section 2 of the Iowa Constitution limits the

---

**1.** The State's fiscal year starts on July 1 and ends the following June 30.

amount of debt the State may lawfully contract. It provides:

> The State may contract debts to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the General Assembly, or at different periods of time, shall never exceed the sum of two hundred and fifty thousand dollars; and the money arising from the creation of such debts, shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever.

■ Our case law makes it clear that notes issued in anticipation of revenue and paid in the year of issue do not constitute debt in the constitutional sense. *Rowley v. Clarke,* 162 Iowa 732, 740–41, 144 N.W. 908, 912 (1913). Case law from other jurisdictions is in accord with this interpretation. *See State Bond Comm'n v. All Taxpayers, Property Owners & Citizens of the State,* 510 So.2d 662, 664–65 (La.1987); *Kelley v. Baldwin,* 319 Pa. 53, 179 A. 736, 739 (1935); *In re State Warrants,* 6 S.D. 518, 62 N.W. 101, 103 (1895). Stanley urges the Series 1991A TRANs were illegal for four reasons. These are: (a) they were issued in anticipation of a budget deficit; (b) they allowed the State to illegally roll over debt from one fiscal year to the next; (c) the proceeds from the sales were used illegally; and (d) the State's agreement with certain banks which issued letters of credit guaranteeing the repayment of the TRANs created unconstitutional debt.

■ A. To comprehend Stanley's argument it is necessary to have a basic understanding of the budget practices of the State. The Department of Management prepares the budget for the governor. It is this department which determines the accounting methods used in preparing the budget. The General Assembly can, through statute, mandate specific procedures be used to calculate the budget. The budget methods used by the State are referred to as Budget Basis Accounting (BBA). BBA is the State's internal method of accounting. The BBA system is subject to manipulation by the Department of Management and the General Assembly. By changing how revenue or expenses are recognized the surplus or deficit projected by the BBA can be changed.

GAAP is a different method of accounting used by the State for purposes other than preparing the budget. GAAP is promulgated and supported by the Government Accounting Standards Board (GASB). GASB is a nongovernmental entity comprised of state governments and individuals. The primary function of GASB is to suggest a standardized accounting system for governmental entities. A standardized system facilitates comparisons between states. It gives investors (such as those who purchase TRANs) a *readily understandable measuring stick* to help evaluate the soundness of their investment. Since every state's internal accounting system may be different and can be manipulated, GAAP allows potential investors to view the state's financial health more objectively.

In preparation for issuing TRANs, the State calculates the budget using both BBA and GAAP. The two sets of figures are then circulated to potential investors. Stanley argues that using GAAP accounting methods the State projected budget deficits for the fiscal years 1990 through 1993. He believes it is unreasonable and illegal for the Treasurer to issue TRANs when GAAP projects deficits. To support his argument that TRANs may not be issued in anticipation of a budget deficit, he cites *Wein v. State,* 39 N.Y.2d 136, 383 N.Y.S.2d 225, 347 N.E.2d 586 (1976). In *Wein,* a taxpayer brought a declaratory judgment action challenging the issuance of TRANs. The court found the TRANs were legal so long as they were retired in the fiscal year they were issued. The court stated:

> if it cannot reasonably be anticipated at the time the notes are issued that the State will have sufficient committed taxes and revenues, based on authentic estimates, to pay the obligations within one year of the date of issue, such borrowing is constitutionally impermissible.

Stanley's argument hinges on the proposition that GAAP is the only valid measure of the State's financial performance. It is true

GAAP gives a more objective view of the State's finances. However, at the time the TRANs were issued the use of GAAP was not required by statute.

In 1994, the General Assembly amended the Code to provide for the elimination of the budget deficit as calculated by GAAP. 1994 Iowa Acts ch. 1181. Beginning with the fiscal year starting on July 1, 1994, the Department of Management was mandated to, on a funds available basis, reduce the GAAP deficit. Iowa Code § 8.57 (1997). Similarly, the Department of Revenue and Finance was directed to eliminate the GAAP deficit and once it was eliminated keep the budget in accordance with GAAP. *Id.* § 421.31(5).

■ No statute prohibits the use of TRANs in the face of a budget deficit. The question is not whether the State will have a budget deficit but rather, does the State at the time the TRANs are issued, reasonably anticipate it will have sufficient revenues to pay back the note in the current fiscal year. If the answer is yes then the TRANs do not constitute debt. *Rowley,* 162 Iowa at 740–41, 144 N.W. at 912. BBA may not give the best projection of the State's financial health, but so long as the budget prepared under that method is reasonable no illegality has occurred. The district court found Stanley had failed to prove the anticipated revenue estimates were unreasonable when made. We agree.

■ B. Stanley asserts the delaying of payment of some school aid appropriations due in one fiscal year until the beginning of the following fiscal year created a "core" of floating debt violating the State Constitution. He urges the timing of the payments combined with the issuing of TRANs allowed the State to maintain a deficit. The scenario Stanley draws is as follows: the State did not have the cash necessary to pay back the TRANs issued during the year and pay the school appropriation. The State therefore delayed making the school aid payment until the beginning of the next fiscal year. When the next year began the State again issued TRANs and used the cash raised from the sale to pay the school aid appropriations that had been delayed.

The Treasurer asserts the payments could have been delayed until enough cash had been collected to pay the expenses. The State continues to collect revenues for the prior fiscal year after its end. Revenues are accounted for on an accrual basis. This means they are counted when earned not when actually received. Under the State's budget practices revenues collected from the prior fiscal year may continue to be received up to sixty days after the end of the fiscal year. Instead of waiting until it had received sufficient tax revenues, the State used cash from the newly issued TRANs to speed the payment of the expenses.

Stanley's argument about a "core" of floating debt is without merit. The State did not violate any statutes nor did it take on contractual debt by delaying payment of the expenditures. The Director of the Department of Management has statutory authority to delay making the installment payments on the school aid appropriations. *See* Iowa Code § 257.16. Delaying the payment from the scheduled date of June 15 to the beginning of the next fiscal year is therefore not inappropriate in and of itself. The delayed payments were accounted for in the budget for the fiscal year in which they were due. Because the TRANs were not used to increase the total amount of funds available to pay expenses no debt in the constitutional sense was created.

■ C. Closely related to the issue of "core" debt is Stanley's assertion that the cash raised from the sale of TRANs was expended illegally. Stanley argues the language of section 12.26(1) prohibits the use of cash raised from the sale of TRANs in one fiscal year from being used to pay expenses from another fiscal year. The language of the statute Stanley relies on states: "[t]he proceeds from the issuance of notes ... shall be used only for the purposes for which the anticipated tax revenues were levied, collected, and appropriated." Iowa Code § 12.26(1). Stanley's argument is that the purposes for which taxes are levied, collected, and appropriated are current expenses not those from prior fiscal years. Thus, his argument concludes, using monies raised by the sale of TRANs based on the current

year's anticipated revenues for prior fiscal year expenses violates the statute.

The Treasurer urged and the district court found that the language of section 12.26(1) should be more broadly interpreted than Stanley argues. The apparently restrictive language in section 12.26(1) is at odds with the legislative findings of section 12.25. Section 12.25 provides:

> The general assembly finds and declares that because of differences in the timing of the receipt of tax and other revenues and the expenditure of funds by the state, the state has been unable to remain timely on its obligations; including its payments of school aid; the untimely payment of state aid has created a hardship for schools by increasing their costs and hindering their ability to remain timely on their obligations; it would be advantageous to the state to be able to issue notes in anticipation of its tax and other revenues in order to coordinate its cash flow; and pending their use, the proceeds of notes issued in anticipation of tax and other revenues should be invested in order to pay the cost of issuing the notes and as a benefit to the state. It is the purpose of this section and section 12.26 to enable the state to make timely payments of its obligations, including school aid payments, by securing funds through the issuance of notes in anticipation of the state's tax and other revenues.

We find the statutes, when construed together, are ambiguous. When more than one statute relates to the same subject matter or to closely allied subjects, they are said to be *in pari materia* and must be construed in light of their common purpose and intent so as to produce a harmonious body of legislation. *State v. McSorley*, 549 N.W.2d 807, 809 (Iowa 1996). When the statutory language is ambiguous, the manifest intent of the legislature is sought and will prevail over the literal import of the words used. *Id.* To ascertain the legislature's intent, we look to the spirit of the statute as well as the words and give it a sensible, workable, practical, and logical construction. *Holiday Inns Franchising, Inc. v. Branstad,* 537 N.W.2d 724, 728 (Iowa 1995).

It is clear from the language of section 12.25 that the legislature intended TRANs be used to allow the State to be more timely in the payment of its obligations. The legislature specifically noted the hardship caused by delayed payments of school aid appropriations. In light of the legislative findings of section 12.25 we believe using the cash raised from the sale of TRANs to make payments held over from the prior fiscal year is in keeping with the legislative intent. While it may be true, as Stanley suggests, that such an action is not prudent financial policy, it is not the court's position to instruct the State on this matter.

■ D. In connection with the TRANs certain banks issued letters of credit promising to pay the note holders if the State defaulted on the TRANs. To obtain the letters of credit the State entered reimbursement agreements with the issuing banks. The agreements provide for reimbursement from "pledged revenues." Pledged revenues were defined in the agreement as "(i) available general fund revenues; (ii) the unexpended proceeds of the notes on deposit in the TRAN proceeds account; (iii) unexpended investment earnings on the TRAN proceeds account; and (iv) investment earnings on amounts deposited in the note retirement fund." The agreement further defined "available general fund revenues" as

> the taxes and revenues of the State which are required by law to be credited to the general fund and which are attributable to the ... fiscal year under the State's budget basis accounting and reporting practices, ... excepting therefrom any amounts which are restricted by law from being pledged.

Stanley insists that the State's potential obligation under the terms of the reimbursement agreement are not limited to any one fiscal year. This he argues created an obligation not payable out of current revenue and thus constitutes debt. The district court found by the terms of the agreement repayment was limited to revenues received for the fiscal year in which the TRANs were issued. We agree with the finding of the district court.

IV. *Summary.*

We find no error in the district court's ruling. The Series 1991A TRANs were validly issued based on the anticipated revenues for the fiscal year. The BBA methods used to project the financial position of the State were not unreasonable. Further, the use of TRANs did not create "core" debt nor was the cash raised by the sale of the TRANs used illegally. Finally, the reimbursement agreement between the State and the banks did not constitute unconstitutional debt. We have considered the other issues and arguments asserted by Stanley and find them to be without merit.

**AFFIRMED.**

All justices concur except LAVORATO, J., who takes no part.