# IN THE COURT OF APPEALS OF IOWA

No. 18-1464
Filed January 9, 2020

**TYLER DIX, JASON CATTELL, JIMMY McCANN, and JULIE ELLER,**
    Plaintiffs-Appellees/Cross-Appellants,

**vs.**

**CASEY'S GENERAL STORES, INC. and CASEY'S MARKETING COMPANY,**
    Defendants-Appellants/Cross-Appellees.
_____

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

An employer appeals the district court's grant of relief to former employees who challenged its drug-testing program under Iowa Code section 730.5. Former employees cross appeal other aspects of the ruling. **AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

Ann H. Kendell of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellants.

David Albrecht of Fielder Law Firm, PLC, Johnston, and Matthew M. Sahag of Dickey & Campbell Law Firm, PLC, Des Moines, for appellees.

Heard by Doyle, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

This case involves employee drug testing conducted by Casey's General Stores, Inc. and Casey's Marketing Company (Casey's) under Iowa Code section 730.5 (2016). Former employees Jason Cattell, Tyler Dix, Julie Eller, and Jimmy McCann challenged the termination of their employment after three of them tested positive and one was unable to give a urine sample.

Following a trial to the bench, the district court found Casey's improperly included Eller and McCann in the pool of safety-sensitive workers from which it selected employees to test. The court awarded Eller back and front pay and awarded McCann back pay. Casey's appeals those awards to Eller and McCann as inequitable and asserts statutory immunity. McCann cross appeals seeking front pay. By contrast, the court found Casey's properly included Cattell and Dix in the testing pool. But the court held Casey's violated the statute by failing to provide those employees with a specific list of drugs to be tested and failing to allow them to provide information relevant to testing. Still, the court did not grant Cattell and Dix relief, finding they did not prove those statutory violations resulted in adverse employment actions. Cattell and Dix cross appeal that decision. Finding no reversible error, we affirm on both the appeal and cross-appeal issues.

## I.    Statutory Requirements and Background Facts

In January 2016, Casey's notified employees at its Ankeny warehouse about a new drug-testing policy authorized under Iowa Code section 730.5. That statute allows private employers to conduct drug and alcohol testing in compliance with detailed safeguards set out in the code and consistent with the employer's

own written policy with proper notice to employees. The employer may test on an unannounced and periodic basis. Iowa Code § 730.5(1)(i).[1]

The employer may elect to test employees selected from certain pools: (1)"[t]he entire employee population at a particular work site," (2) "[t]he entire full-time active employee population at a particular work site," or (3) "[a]ll employees at a particular work site who are in a pool of employees in a safety-sensitive position and who are scheduled to be at work at the time testing is conducted." *Id.* § 730.5(8)(a). For unannounced drug testing, employees must be selected "based on a neutral and objective selection process" and "by an entity independent from the employer" using a "computer-based random number generator." *Id.* § 730.5(1)(*l*). The procedure should ensure "each member of the employee population subject to testing has an equal chance of selection for initial testing." *Id.* The testing "shall be carried out within the terms of a written policy," and such policy must be "provided to every employee subject to testing" and "available for review by employees." *Id.* § 730.5(9)(a)(1).

The statute allows employers to take disciplinary action against employees who test positive or refuse to test including termination of their employment. *Id.* § 730.5(10)(a)(3). And the statute gives "an aggrieved employee" a civil cause of action against "[a] person who violates this section." *Id.* § 730.5(15)(a). But the statute affords an employer immunity from a cause of action if the employer acts in good faith following a positive test if the employer "has established a policy and

---

[1] Another provision of the statute permits testing when there is "reasonable suspicion" that the employee "is using or has used alcohol or other drugs" including when the employee "has caused an accident while at work." Iowa Code § 730.5(1)(i), (8)(c). That provision is not at issue in this case.

initiated a testing program" in accordance with the safeguards in the statute. *Id.* § 730.5(11), (11)(a).

Against that statutory backdrop, Casey's unveiled its new testing policy. Cattell, Dix, Eller, and McCann all received the policy. Casey's planned to perform drug tests on a periodic basis without advanced notice to employees. The policy stated Casey's would select employees for testing at "random" from "a pool of employees in a safety-sensitive position who are scheduled to be at work at the time testing is conducted." The policy also stated, "All employees have an equal chance of being selected." Casey's advised it would terminate any employee who gave a confirmed positive test, refused to take a test, or failed to provide an adequate sample.

Casey's contracted with an outside laboratory, ARCpoint, to select the employees and administer the tests. Casey's also contracted with an outside lab to conduct the medical review mandated under section 730.5(7)(h) (requiring a medical review officer to interpret any confirmed positive test results to ensure any information provided by the individual is considered before reporting the results to the employer).

In April 2016, Dix, Cattell, McCann, and Eller all worked at Casey's Ankeny warehouse. Casey's designated all warehouse employees as holding safety-sensitive positions. When those employees received notice of the new policy, they signed an acknowledgment of their understanding. In the warehouse, Dix and Cattell worked on heavy-duty tasks such as building pallets and operating forklifts to load trucks. McCann and Eller performed light-duty assignments in the tobacco

returns area. That area was cordoned off within the warehouse by a chain-link fence, earning the structure its nickname—"the cage."

Casey's administered its first unannounced test on April 6, 2016. The day before, Casey's gave ARCpoint a roster of the 184 employees scheduled to work at the warehouse. Casey's asked ARCpoint to select 90% of the names for testing.[2] To select employees to be tested, ARCpoint used an internet-based random number generator, called Research Randomizer.[3] As it turned out, due to absences and other circumstances, Casey's ended up testing all employees at work on April 6. The four plaintiffs were on the original list of selected employees.

On testing day, Casey's Vice President Jay Blair gathered all employees in the warehouse, announced the testing, and informed them, "If any of you are taking a prescription, do not discuss it with us. You should proceed to the test and, if applicable, the Medical Review Officer will contact you at a later date to substantiate the prescription." He also said, "If any of you wish to refuse to test, you are free to leave at any time and it is regarded as a resignation."

Casey's moved employees into "holding areas" so they could not leave or falsify tests. From there, Casey's escorted the employees in pairs to the

---

[2] Internal emails showed management would have preferred to test all the employees but felt they could not justify 100% selection as "random." Testimony from human resources supervisor shows Casey's intended to follow its policy to test only employees in safety-sensitive positions.

[3] Research Randomizer acknowledges,

> [a]s with most computer-based "random number generators," this program is best described as a "pseudo-random number generator" because the numbers are generated by use of a complex algorithm (seeded by the computer's clock) that gives the appearance of randomness.

About, Research Randomizer, http://www.randomizer.org/about/ (last visited Jan. 5, 2019).

warehouse restrooms where they entered individual stalls and provided urine specimens. Casey's and ARCpoint employees were present in the restrooms outside the stalls and collected the specimens for testing. ARCpoint employees conducted initial tests at the warehouse. Employees tested either "negative" or "nonnegative." Casey's informed employees who had "nonnegative" tests that they were suspended. Later, employees with "nonnegative" initial tests received by certified letters the results of confirmatory tests specifying the drugs detected.

Cattell, Dix, and McCann gave their samples as directed. Cattell and McCann both tested positive for marijuana and amphetamine; Dix tested positive for marijuana. Casey's ultimately fired all three. Eller did not provide a specimen sufficient for testing on the first try. Casey's provided her water to drink, but she was still unable to provide a sufficient sample on the second try. At that point, Eller chose to leave, and Casey's deemed her action to be a voluntary resignation.

Cattell, Dix, Eller, and McCann filed civil claims against Casey's under section 730.5(15). The district court consolidated their actions. After extensive pretrial litigation, the parties tried the claims to the bench.

## II.    District Court Decision

At trial, the employees alleged Casey's violated the statute in numerous ways. Their threshold allegation dealt with the selection of the employees to be tested. The employees then claimed even if Casey's properly selected them, the employer violated the statute in carrying out the drug test in six ways: (1) failing to pursue periodic testing; (2) failing to identify the warehouse as a collection site; (3) failing to properly train its employees in administering the testing; (4) failing to provide adequate privacy at the testing site; (5) failing to give employees an

adequate opportunity to provide relevant information; and (6) failing to give employees a specific list of the drugs being tested.

Resolving the threshold issue, the district court concluded Casey's method for selecting employees for testing substantially complied with the statute with one exception—the court found Casey's improperly designated McCann and Eller, as being in "safety-sensitive positions." Because Casey's should not have tested Eller and McCann in the first instance, the district court granted them relief.

On the other claims related to selection of employees for testing, the district court found Casey's substantially complied with the statute. On the remaining six claims regarding testing procedures, the district court agreed with Cattell and Dix on two points: (1) Casey's did not give employees adequate opportunity to provide additional information relevant to the testing and (2) Casey's did not give the employees a list of the drugs being tested. The court found both defects violated the statute. But the court also found Cattell and Dix did not prove they suffered an adverse employment action as a result of these defects and were not, therefore, "aggrieved" under the statute. For that reason, the court found they could not obtain relief.

Casey's appeals the district court's grant of relief to Eller and McCann. Eller and McCann defend the court's ruling on their claims and, joining Cattell and Dix, cross-appeal the denial of their remaining claims.

### III.    Scope of Review/Compliance Standard

The parties differ on the scope of review. To settle their dispute, we look first to the language of the statute.

The civil remedies subsection states:

> a. This section may be enforced through a civil action.
> (1) A person who violates this section or who aids in the violation of this section is liable to an aggrieved employee or prospective employee for affirmative relief including reinstatement or hiring, with or without back pay, or any other equitable relief as the court deems appropriate including attorney fees and court costs.

Iowa Code § 730.5(15). The statute also provides for injunctive relief. *See id.* § 730.5(15)(a)(2).

Casey's seizes on the availability of equitable relief to argue the district court sat in equity and thus our review would be de novo. *See* Iowa R. App. P. 6.907. On the other side, the employees note we review questions of statutory construction for correction of errors at law. *See Ryan v. Heritage Trails Assocs., Inc.*, 745 N.W.2d 724, 728 (Iowa 2008). Our supreme court reviewed for correction of legal error in its most recent cases under section 730.5. *See Ferguson v. Exide Tech., Inc.*, ___ N.W.2d ___, ___, 2019 WL 6794312, at *2 (Iowa 2019); *Sims v. NCI Holding Corp.*, 759 N.W.2d 333, 337 (Iowa 2009); *but see Skipton v. S & J Tube, Inc.*, No. 11-1902, 2012 WL 3860446, at *4–5 (Iowa Ct. App. Sept. 6, 2012) (reviewing de novo because case was tried in equity with no evidentiary objections). In *Sims*, the parties submitted the case by stipulated facts. 759 N.W.2d at 337.[4] Following *Sims*, we will review for correction of errors at law.

We will affirm the district court's findings of fact if they are supported by substantial evidence. *Tow v. Truck Country of Iowa*, 695 N.W.2d 36, 38 (Iowa 2005). Evidence is substantial if a reasonable mind would accept the evidence as

---

[4] This court has also reviewed for legal error in a recent case. *Whitman v. Casey's Gen. Stores, Inc.*, No. 18-1320, 2019 WL 4678172, at *2 (Iowa Ct. App. Sept. 25, 2019) (further review pending).

adequate to reach the same findings. *Frontier Props. Corp. v. Swanberg*, 488 N.W.2d 146, 147 (Iowa 1992).

The parties also spar over the level of compliance necessary to satisfy section 730.5. The employees argue Casey's must meet the statutory requirements with strict compliance. They acknowledge *Sims* held substantial compliance with the notice requirements was adequate. *See* 759 N.W.2d at 338. But they view *Sims* as a narrow exception. We disagree. Substantial compliance means satisfying the reasonable objectives of a statute as to essential matters. *Id.* Our courts have adopted that level of compliance for other important matters. *See, e.g.*, *State v. Myers*, 653 N.W.2d 574, 578 (Iowa 2002) (guilty plea colloquy); *Nedved v. Welch*, 585 N.W.2d 238, 240 (Iowa 1998) (disclosure of expert witnesses); *Iowa Dep't of Human Servs. ex rel. Greenhaw v. Stewart*, 579 N.W.2d 321, 323 (Iowa 1998) (notices of appeal); *Brutsche v. Coon Rapids Cmty. Sch. Dist.*, 255 N.W.2d 337, 342 (Iowa 1977) (notice of an election). We believe substantial compliance applies to all mandates in section 730.5.

## IV.    Analysis

Casey's challenges the finding Eller and McCann were not safety-sensitive employees subject to drug testing and their awards. In doing so, Casey's invokes the employer immunity clause. *See* Iowa Code § 730.5(11)(a).

In response, the employees argue because Casey's failed to comply with the provisions of 730.5, the employer both lost immunity and is liable for the adverse employment decisions it made regarding all the plaintiffs. McCann also argues he should have been awarded front pay like Eller.

## A. Employer Immunity Clause

We start by interpreting the immunity clause. It provides:

> **Employer immunity.** A cause of action shall not arise against an employer who has established a policy and initiated a testing program in accordance with the testing and policy safeguards provided for under this section, for any of the following:
> a. Testing or taking action based on the results of a positive drug or alcohol test result, indicating the presence of drugs or alcohol, in good faith,[5] or on the refusal of an employee or prospective employee to submit to a drug or alcohol test.

Iowa Code § 730.5(11). Casey's gleans three requirements from this provision: (1) establish a policy in accordance with the statutory safeguards; (2) initiate a testing program, also in compliance with the statute; and (3) take action based on a positive drug test in good faith. Casey's believes it satisfied all three conditions. And therefore, it claims immunity from liability for testing Dix, Cattell, McCann and Eller and from taking actions based on positive test results for Dix, Cattell, and McCann and on the test refusal by Eller.

The district court reasoned an employer who violates section 730.5 "is no longer immune from liability." Thus the court rejected Casey's immunity claim because the employer violated the statute by placing Eller and McCann in the safety-sensitive employees' pool and by not providing a list of drugs to be tested or giving employees the opportunity to provide relevant information. That reasoning leads us on a somewhat circular path. An employer who violates the statute cannot benefit from the immunity, but an employer who does not violate the

---

[5] The statute defines "good faith" as "reasonable reliance on facts, or that which is held out to be factual, without the intent to be deceived, and without reckless, malicious, or negligent disregard for the truth." Iowa Code § 730.5(1)(f).

statute has no need for immunity because an employee would have no viable claim. We strive to construe the statute to avoid that circularity.

We begin that quest with the text of the statute. *See Gardin v. Long Beach Mortg. Co.*, 661 N.W.2d 193, 197 (Iowa 2003). "We do not search beyond the express terms of a statute when that statute is plain and its meaning is clear." *Id.* We also read a statute as a whole to reach a sensible and logical construction. *Id.* When the debate is over a word or phrase, we examine the context in which it is used. *Exceptional Persons, Inc. v. Iowa Dep't of Human Servs.*, 878 N.W.2d 247, 251 (Iowa 2016). When the legislature has not defined a term, we look to its ordinary meaning, sometimes by reference to a dictionary. *See Gardin*, 661 N.W.2d at 197. "A statute is ambiguous if reasonable minds could differ or be uncertain as to the meaning of a statute." *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018).

Although the legislature enacted the byzantine provisions of section 730.5 decades ago, only a handful of appellate cases interpret these drug-testing measures and only one case interprets the immunity provision. In an unpublished disposition, a panel of this court determined the immunity provision did not apply to an employer who violated the statute in the "administration" of the test. *See Skipton*, 2012 WL 3860446, at *6. The employer tested Skipton in the absence of a workplace accident, contrary to its own written policy. *Id.* We wrote, "We leave aside the question of whether [the employer's] written policy was in accordance with section 730.5 because the evidence clearly shows its testing program was not administered in accordance with the testing and policy safeguards in that code

section." *Id.* (emphasis added). Accordingly, we found the employer was not immune from liability. *Id.*

Casey's takes issue with *Skipton*, pointing out the immunity provision does not require drug tests be "administered" in accordance with the statute. We agree *Skipton* unnecessarily focused on how the employer "administered" the test rather than on whether the employer "established" a policy and "initiated" a testing program that complied with the statutory safeguards.[6]

Unbound by that analysis in *Skipton*, we consider the scope of the employer immunity clause. We find the employer-immunity provision at section 730.5(11) is ambiguous when viewed in the context of the entire drug-testing statute. When statutory language is ambiguous, we seek the "manifest intent of the legislature." *Stanley v. Fitzgerald*, 580 N.W.2d 742, 747 (Iowa 1998). To ascertain that intent, "we look to the spirit of the statute as well as the words and give it a sensible, workable, practical, and logical construction." *Id*.

At trial, counsel for Casey's argued section 730.5(11) showed the intent of the legislature "to protect employers from liability for the activities of third parties." Counsel explained:

> So the legislature puts the burden on the employer to have an
> independent entity do randomization, to have . . . a qualified lab,
> perform the results or the testing of the results as well as medical
> review officer to interpret those results. Those are all things outside
> of the employer's control, and it is clear that the legislature therefore

---

[6] "Administer" carries a meaning distinct from the statutory terms "establish" and "initiate." "Administer" means "to have charge of; manage." *Administer*, American Heritage Dictionary (2nd College Edition 1982). But to "establish" a policy, an employer would "introduce [it] and put [it] into force." *Establish*, American Heritage Dictionary. And to "initiate" a testing program, an employer would "cause [it] to begin." *Initiate*, American Heritage Dictionary. Thus, the statutory words have a foundational aspect, while the verb used in Skipton does not.

intended to protect the employer from any issues with regard to that by allowing for immunity under this section.

Casey's returns to this position as its fallback on appeal. The employer contends: "It is, at a minimum, a reasonable interpretation of the statute that the legislature wanted to immunize employers acting in good faith from liability arising from third parties' statutory violations."

We agree it is reasonable to construe section 730.5(11)(a) as inoculating employers only from suits arising from third-party conduct. Such a construction resolves the apparent circularity of the immunity clause and is consistent with the civil remedy at section 730.5(15) being applicable against "[a] person" rather than exclusively the employer. And even then, the employer would enjoy immunity only if it established a policy and initiated a testing program in line with statutory safeguards, and drug tested or took action based on a positive test, in good faith.

We realize our supreme court has characterized statutory immunities—in other contexts—as having a broad scope. *See Cubit v. Mahaska Cty.*, 677 N.W.2d 777, 784 (Iowa 2004) (interpreting section 670.4(11) and collecting cases). But the court has also recognized section 730.5 offers "protections for employees who are required to submit to drug testing." *Sims*, *759* N.W.2d at 338; *see Harrison v. Emp't Appeal Bd.*, 659 N.W.2d 581, 588 (Iowa 2003) ("Although the legislature now allows random workplace drug testing, it does so under severely circumscribed conditions designed to ensure accurate testing and to protect employees from unfair and unwarranted discipline."). Limiting an aggrieved employee's ability to enforce those protections through a broad application of

employer immunity would defeat the legislature's detailed list of safeguards in the testing and notification process. *See* Iowa Code § 730.5(6)–(8), (15).

Under that construction, the employer immunity clause would not insulate Casey's from its own actions allegedly in violation of section 730.5. Instead, for those actions, Casey's would avoid liability only if it can show substantial compliance with the statutory requirements for drug-testing in the workplace.

Having addressed Casey's employer-immunity claim, we turn to the violations alleged by the employees, starting with the misclassification of Eller and McCann as holding safety-sensitive positions.

## B. Safety-Sensitive Position Employees

The district court found Casey's violated the statute by including Eller and McCann in the pool of employees eligible for random testing though they did not hold safety-sensitive jobs. As discussed above, the statute authorizes employers to conduct unannounced drug tests of all employees at a particular work site or all employees who hold a safety-sensitive positions at a particular work site. Iowa Code § 730.5(8)(a). The statute defines a "safety-sensitive position" to mean "a job wherein an accident could cause loss of human life, serious bodily injury, or significant property or environmental damage, including a job with duties that include immediate supervision of a person in a job that meets the requirement of this paragraph." *Id.* § 730.5(1)(j). Casey's policy statement uses virtually identical language to define a safety-sensitive position. And Casey's notice to employees about the policy stated it would only test those in safety-sensitive positions.

Casey's now asserts every employee working in the warehouse had a safety-sensitive position. Casey's argues, with forklifts "zipping" around and boxes

stacked to the ceiling, an accident could result in anyone at the warehouse getting hurt. That argument did not convince the district court, which emphasized it is not the warehouse environment but the duties the particular employee discharges that determine whether the job is safety-sensitive:

> [T]he fact that a light-duty warehouse employee (or a human resources employee) is injured in the warehouse when struck by an errant forklift driver does not make the former a safety-sensitive position. It is the operation of the forklift that makes its driver a safety-sensitive position, not the environment in which it is operated.

Casey's contends that ruling improperly usurped its business judgment.[7] Because the employer would be liable for a warehouse accident, Casey's reasons it should determine whether a job is classified as safety-sensitive. Further, Casey's urges it was the legislature's intent that the employer identify safety-sensitive employees. *See* Iowa Code § 730.5(9)(f) ("An employee . . . who is designated by the employer as being in a safety-sensitive position shall be placed in only one pool of safety-sensitive employees subject to drug or alcohol testing . . .)."

We see no authority for the view that the employer's designation trumps the statutory definition, particularly when Casey's handbook definition tracks the statute. And section 730.5(9)(f) only admonishes the employer not to multiply a

---

[7] The Iowa Association of Business and Industry, as amicus curiae, also supports this position and argues the employer's designations should be given deference as a "business judgment." We hear amicus's warning that courts should not "sit as super-personnel departments" and review the decisions of a business that is in a better position to decide what positions are safety-sensitive. *Elam v. Regions Fin. Corp*, 601 F.2d 873, 880 (8th Cir. 2010). But the case before us is not a close one where the employer's knowledge of the conditions puts it in a better position to understand the dangers and risks involved. The duties performed by Eller and McCann clearly did not meet the definition of "safety-sensitive."

particular employee's chance of being selected for testing by placing that employee in more than one pool of safety-sensitive employees.

No Iowa cases interpret "safety-sensitive position" as used in this statute. But the district court's logic is bolstered by other authority. For instance, in *Skinner v. Ry Labor Executives' Ass'n*, 489 U.S. 602, 629 (1989), the Supreme Court justified drug testing without an individualized suspicion as a compelling government interest noting, "Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Significantly, the employee who "discharges duties" involving those risks is subject to testing.

Other jurisdictions agree job duties determine the employee's status. *See Bryant v. City of Monroe*, 593 Fed. Appx. 291, 297 (5th Cir. 2014) (finding city's interest in drug testing safety-sensitive jobs applied to truck driver because duties included "driving City vehicles and transporting co-workers, operating heavy groundskeeping equipment, handling pesticides, and working in high-risk areas such as highway medians"); *Kreig v. Seybold*, 427 F. Supp. 2d 842, 854–55 (N.D. Ind. 2006) (approving drug testing of employee whose job duties included operating a riding mower on a median or embankment, traveling at high rates of speed, and using other equipment that "might become 'lethal' when 'operated negligently'"); *Am. Fed'n of Teachers-W. Va., AFL-CIO v. Kanawha Cty. Bd. of Educ.*, 592 F. Supp. 2d 883, 902 (S.D. W. Va. 2009) ("For an employee to occupy a truly safety sensitive position, it is not enough to show that the employee has some interest or role in safety. Rather, the government must demonstrate that the

employee's position is one that in the ordinary course of its job performance carries a concrete risk of massive property damage, personal injury or death.").

With that legal foundation in mind, we look to the plaintiffs' job duties. Without question, Cattell and Dix did heavy-duty work—building inventory pallets and operating forklifts. So they were properly included in the pool of safety-sensitive employees. Not so with Eller and McCann, who did light-duty work. They processed returns of tobacco products in "the cage"—a protected area they entered and exited through one door. Their duties did not involve any tasks where an accident could risk loss of life, injury, or significant damage to property or the environment. Even if the general warehouse environment was dangerous, as Casey's maintains, Eller and McCann were protected during the normal course of their work. Substantial evidence supports the district court's finding Eller and McCann were not in safety-sensitive positions and thus not subject to drug testing under the employer's policy.

Casey's counters it does not matter if it violated its own policy in placing Eller and McCann in the safety-sensitive pool because the statute authorizes employers to designate a pool consisting of all the employees at a particular worksite. *See* Iowa Code §§ 730.5(8)(a)(1), (2). That option does not help Casey's here. Employers can only test "within the terms of a written policy." *Id.* § 730.5(9)(a)(1). Casey's policy limited testing to "employees in a safety-sensitive positions." Casey's breached its policy, and in turn the statute, by testing Eller and McCann. The testing resulted in their termination. The district court correctly found Casey's is liable to Eller and McCann under section 730.5(11).

Because Eller and McCann properly obtained relief on this basis, we need not reach their remaining claims. We next turn to the claims by Cattell and Dix that Casey's violated numerous other provisions in section 730.5.

### C. Other Alleged Violations

Employees Cattell and Dix claim Casey's violated the statute in a dozen different ways. For ease of analysis, we group the alleged violations as deficiencies in the selection process and deficiencies in the testing procedure.

### 1. Selection Process

The employees allege Casey's included a handful of people in the testing pool who were not working that day, excluded a handful of people without explanation, used only a "pseudo-random" number generator to select which employees to test, and ended up testing 100% of the employees present. After considering these allegations, the district court found Casey's substantially complied with the statutory requirements surrounding selection. We agree.

The day before the test, Casey's provided ARCPoint, an independent and impartial entity, with a roster of employees scheduled to work in the warehouse.[8] ARCPoint made the random selections and provided a list of alternates. It was reasonable for Casey's to list employees expected on the job, even if it did not account for various absences the next day. ARCPoint used a "pseudo-random" number generator to select employees to test. The purpose of the statutory requirements at the selection phase is to ensure employees are selected "based

---

[8] We recognize Casey's may assert immunity under section 730.5(11) for the actions of ARCPoint or other third-party actors, but we need not decide on that ground because we find substantial compliance with the selection and testing requirements in the statute.

on a neutral and objective" process and each has "an equal chance of selection for initial testing." *Id.* § 730.5(1)(*l*).

This procedure, while not mathematically perfect in distributing the chance of being selected, assured the reasonable objectives of the statute. *See Sims*, 759 N.W.2d at 338. In addition, even though Casey's wanted to test 90% of its warehouse employees and ended up testing them all, the statute does not prescribe any particular percentage the employer may select from a properly drawn pool. Plus, the plaintiffs were all selected in the first draw, so enlarging the selection percentage did not affect them. Casey's ensured the selection criteria were neutral and objective and allowed an independent, neutral entity to make the random selections using a computer-modeled random-number generator. Employees had a roughly equal chance of being picked, though some upper management were excluded and two other workers inadvertently left off the roster. We find no error in the district court's conclusion Casey's substantially complied with the selection procedure outlined by statute.

### 2.    Testing Procedure

We now examine the alleged deficiencies of the testing procedure. First, the employees complain Casey's used the warehouse as a collection site contrary to the policy requiring referral to "[a] certified collection site such as an occupational health center, a hospital or otherwise identified clinic or facility to which a prospective or current employee may be sent for a drug test or alcohol test." But the policy makes clear any "confirmatory" testing would occur at a certified site. The statute does not specify where initial collection or testing must occur. Casey's substantially complied with the statute in this respect.

Second, the employees allege Casey's violated section 730.5(7)(a) ("The collection of samples shall be performed under sanitary conditions and with regard for the privacy of the individual . . . "). The employer took employees to either the men's or women's restrooms where they produced a urine sample inside a stall with the doors closed. These steps constituted substantial compliance with the statutory requirement.

Third, the employees argue Casey's failed to give supervisory personnel training required under section 730.5(9)(h). The record shows human resources supervisor, Marcella Burkheimer, and human resources specialist, Melinda Karl, both had the requisite hours of training. Burkheimer and Karl supervised the testing but delegated certain duties to staff. The staff monitored warehouse workers waiting to be tested, assisted them in filling out a chain-of-custody form, and escorted them from the holding area to the restrooms. The district court concluded "training is not required for employees engaged in the sort of ministerial tasks delegated" to them on testing day. We agree. Casey's substantially complied with the training requirement.

Fourth, the employees argue Casey's failed to show it tests on a periodic basis under section 730.5(1)(*l*). The record here discloses only what happened on Casey's first administration of its new testing program. As the district court found, the employees cannot establish a violation on this limited record.

The employees' fifth and sixth claims focus on their right to offer medical information relevant to the testing, under the following provision.

> An employee or prospective employee shall be provided an opportunity to provide any information which may be considered relevant to the test, including identification of prescription or

> nonprescription drugs currently or recently used, or other relevant medical information. To assist an employee or prospective employee in providing the information described in this subparagraph, the employer shall provide an employee or prospective employee with a list of the drugs to be tested.

*Id.* § 730.5(7)(c)(2).

The employees believed Casey's should have assured their opportunity to provide relevant information when the employer collected the urine samples, not later when the employees interacted with the medical review officer. They also argue Casey's was not precise enough in disclosing a list of drugs to be tested. The district court agreed with the employees on these points.[9]

We view the record differently. Substantial evidence does not support the conclusion Casey's notice was too vague or over-inclusive as to what drugs were to be tested. The policy warned employees that testing may detect "[a]ny drug or substance defined as a controlled substance . . . under the Federal Controlled Substances Act." We agree that alone might be inadequate to identify the particular drugs to be tested. But the policy went on to state, "Said substances include, but are not necessarily limited to cocaine, phencyclidine (PCP), opiates, amphetamines, marijuana, MDMA (ecstasy), and 6-acetylmorphines (6-AM)." This list is sufficiently specific—and includes amphetamine and marijuana, the two drugs found in the plaintiffs' samples.

---

[9] Although the district court concluded Casey's violated the statute in these two ways, the court declined to grant relief, finding the employees did not establish the violations "adversely affected their employment" and therefore, they were not "aggrieved" as that term is used in section 730.5(15). Because we conclude Casey's substantially complied with section 730.5(7)(c)(2), we do not reach the question whether the district court's reading of "aggrieved" was correct.

We also disagree that Casey's violated the statute by giving notice of the drugs to be tested too far in advance. The purpose of the notice is to enable employees to share information about their medications that could be relevant to the test results. *Id.* § 730.5(7)(c)(2). The district court interpreted the statute to require Casey's to provide the notice at the time of testing because the legislature placed the requirement immediately before the provision discussing review by a medical control officer. We agree it makes sense for the employee to provide their "additional information" close to the time of testing. But the statute's text does not prescribe the timing of the employer's notice of drugs to be tested. *See State v. Rivera*, 614 N.W.2d 581, 584 (Iowa Ct. App. 2000) ("The court cannot read into a statute something that the legislature did not make apparent by the language."). Casey's substantially complied with the statute by distributing the list of drugs a few months before the testing.

Similarly, the statute does not require the employer to afford employees the opportunity to give their "relevant information" when they submit their sample. In fact, requiring those disclosures then could force employees to reveal private information before they tested positive. Relatedly, Iowa Code section 730.5(7)(h) provides

> A medical review officer shall, prior to the results being reported to an employer, review and interpret any confirmed positive test results, including both quantitative and qualitative test results, to ensure that the chain of custody is complete and sufficient on its face and that any information provided by the individual pursuant to paragraph "c", subparagraph (2), is considered.

Until the medical review officer is called to "review and interpret any confirmed positive test result," an employee's additional information is not necessary.

After the plaintiffs gave their samples and the initial testing showed "nonnegative" results, ARCPoint sent the samples to the Quest laboratory to perform the confirmatory tests. Quest forwarded the confirmatory tests to Global Lab Solutions and their medical review officer. She contacted the plaintiffs with confirmed positive tests. Cattell and Dix both testified they spoke with the medical review officer and gave her relevant information. On this record, we conclude Casey's substantially complied with section 730.5(7)(c)(2).

Because Casey's substantially complied with all statutory provisions challenged by Cattell and Dix, we affirm the district court's denial of relief to those employees.[10]

### D. Awards to Eller and McCann

An employer who violates section 730.5 is liable for "affirmative relief including reinstatement or hiring, with or without back pay, or any other equitable relief as the court deems appropriate." Iowa Code § 730.5(15)(a). The district court awarded McCann $94,889.05 in back pay but denied his claim for front pay. The court awarded Eller $85,630.75 in back pay and $96,871.72 in front pay.[11] Awards for both back pay and front pay are subject to the employee's duty to mitigate damages. *Skipton*, 2012 WL 3860446, at *8.

---

[10] Cattell and Dix contend the court should have awarded them attorney fees. Under section 730.5(15) the court may award affirmative relief "as the court deems appropriate including attorney fees and court costs." *See Sims*, 759 N.W.2d at 340. But because Cattell and Dix did not prevail at trial or on appeal, they are not entitled to attorney fees.

[11] The court calculated these figures from stipulated wage rates. The amounts are not in dispute.

We review an award for back pay to determine if it was "supported by substantial evidence or was induced by an improper application of law." *Tow*, 695 N.W.2d at 38. Front pay is available when reinstatement is inappropriate.[12] *Ogden v. Wax Works, Inc.*, 29 F. Supp. 2d 1003, 1011 (N.D. Iowa 1998). Factors to considered when calculating front pay include plaintiff's age, length of employment, likelihood employment would have continued, plaintiff's work and life expectancy, plaintiff's ability to work, plaintiff's ability to work for defendant, and plaintiff's status as an at-will employee. *Id.* at 1015. The question whether to award front pay presents a challenging issue for the district court because it is based on many factors, and the court must consider all the appropriate circumstances involved for determining equitable relief. *Standley*, 5 F.3d at 322.

Casey's argues Eller and McCann are not entitled to back pay because they did not sufficiently mitigate their damages, or in Eller's case, make any attempt to mitigate damages. Eller and McCann point out the burden is on the employer to prove (1) other substantially equivalent positions were available to the employees and (2) the employees failed to use reasonable diligence in attempting to secure such a position. *See Children's Home of Cedar Rapids v. Cedar Rapids Civil Rights Comm'n*, 464 N.W.2d 478, 482 (Iowa Ct. App. 1990).

The plaintiffs also argue the employer must offer substantial evidence they could have mitigated their losses. *See Greenwood v. Mitchell*, 621 N.W.2d 200,

---

[12] Front pay is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 846 (2001); *see also Standley v. Chilhowee R-IV Sch. Dist.*, 5 F.3d 319, 322 (8th Cir. 1993) (stating "front pay is an equitable remedy and may be awarded at the court's discretion").

205 (Iowa 2001). The duty to mitigate requires only reasonable action by the employee. *Children's Home*, 464 N.W.2d at 482 ("We disagree with the employer's interpretation of reasonable care and diligence as meaning that the discharged employee is required to make every effort to find employment. A claimant is only required to make every reasonable effort to mitigate damages and is not held to the highest standard of diligence." (cleaned up for readability)).

Casey's argues McCann is not entitled to back pay because he turned down a job at a plumbing supply warehouse to start his own business. McCann texted with the plumbing supply manager about a job but ultimately decided to cash out his retirement account to start a food truck business. From the inception of the business until trial, he had not yet turned a profit. McCann testified the plumbing supply job was in Des Moines, but he lives in Pleasantville and his daughter goes to school in Pella; he did not want to miss her activities due to the distance. But in texts with the manager, McCann also mentioned he "enjoyed a 'left handed cigarette' at the end of the day so the prescreening test would be an issue" if he began employment there.[13] Although it was skeptical of his rationale for declining the plumbing job, the district court could not conclude McCann acted unreasonably.

We agree Casey's did not show McCann acted unreasonably in pursuing the food truck business. He testified about his earnest efforts to set up the business and the risks he was taking. The limited financial record shows that while the business had a gross profit of $14,485 in 2017, McCann had a negative net

---

[13] McCann explained by "left-handed cigarette" he meant marijuana.

income of $19,321 after considering his expenses. McCann's testimony and the financials support the finding he acted with reasonable care and diligence in starting his business. *See Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1065 (8th Cir. 1988) (finding discharged employee's efforts to mitigate damages were reasonable though he turned down a job offer to pursue his own business venture). The district court appropriately awarded McCann back pay.[14]

McCann argues he should have gotten front pay as well. The district court rejected that request finding McCann, then age of thirty-eight, was "in the prime of his work life and able-bodied." The court noted, "[T]here appears to have been no adverse effects from his termination that would have prevented him from making a timely return to the job market." McCann took the risk of starting the business rather than pursuing the plumbing supply job or a similar position with more certain wages. Under these circumstances, although we conclude McCann did not act unreasonably in pursuing a business that did not immediately make a profit, we do not find front pay is warranted.

As for Eller, Casey's argues she did not make any effort to mitigate her damages because she did not search for new work after her termination. Casey's cites *Quint v. A.E. Staley Manufacturing Co.*, where the court reduced the award

---

[14] Casey's also argues McCann was not entitled to relief because he did not have "clean hands" given his drug use. *See Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 184 (Iowa 1987) ("The clean hands doctrine stands for the principle that a party may be denied relief in equity based on his inequitable, unfair, dishonest, fraudulent, or deceitful conduct."). We decline to apply that equitable principle here, particularly because we affirm the finding Casey's was not authorized to test McCann.

for back pay for the "utter failure" to seek similar employment. 172 F.3d 1, 16 (1st Cir. 1999).

Rejecting the employer's argument, the district court noted Eller's considerable physical restrictions, her age of fifty-one, and credited expert testimony that she is likely unable to find work. Eller presented evidence from a vocational specialist that seeking employment would have been futile based on her restrictions that "drastically reduced if not totally eliminated" her access to the job market. Casey's did not offer any countering evidence. We find substantial evidence supports the conclusion that other jobs are unavailable to Eller and her failure to seek other employment was reasonable under these circumstances.

Casey's also contends Eller was not entitled to front pay if she was disabled and could no longer work. *See Children's Home*, 464 N.W.2d at 482. This argument is unpersuasive because Eller testified she could have continued in her light-duty job at Casey's as she had been performing it, if she had not been fired. The district court properly awarded Eller back and front pay.

Because we find no reversible errors in the district court's ruling, we affirm on both the appeal and cross appeal claims.[15]

**AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

---

[15] Our court files another case challenging employer actions under section 730.5 today, *Woods v. Charles Gabus Ford, Inc.*, No. 19-0002, 2020 WL _____, at *___ (Iowa Ct. App. Jan 9, 2020).